# WALL v. OYSTER.*

SCHOOLS; CONSTITUTIONAL LAW; HEARING; MANDAMUS; NEGROES.

1. Congress, which exercises all the functions of a State legislature in the District of Columbia, has power to provide for the separation of white and colored children in the public schools.

2. D. C. Rev. Stat. secs. 281, 282, 306, 310, 314, which provides for the maintenance of separate free schools for white and colored children, is not invalid for failure expressly to provide for notice and hearing to persons denied enrolment in one or the other school. (Citing Allman v. District of Columbia, 3 App. D. C. 25.) The statute does not prohibit notice or hearing.

3. Inasmuch as no definition of the word "colored" was given by Congress in the act which provides for separate free schools for white and colored children (D. C. Rev. Stat. secs. 281, 282, 306, 310, 314), the duty was necessarily devolved, in the first instance, at least, upon the board of education to determine what children are white and what are colored.

4. The powers conferred upon the board of education of this District, in respect of the management and control of the public schools of the District, are general, and contemplate the exercise of a broad discretion; and mandamus will not lie to correct mere errors of judgment by the board so long as it acts within its statutory authority. (Citing United States ex rel. Nalle v. Hoover, 31 App. D. C. 311.)

5. D. C. Rev. Stat. secs. 281, 282, 306, 310, 314, confer no authority upon the board of education to exclude a white child from a white school, or a colored child from a colored school, and either of such acts would be in excess of its jurisdiction.

6. The determination of the board of education that a child is "colored," and not entitled to admission to a free white school, is subject to judicial review. (Citing Roberts v. United States, 13 App. D. C. 38, s. c. 176 U. S. 221, 44 L. ed. 443, 20 Sup. Ct. Rep. 376.)

---

*Schools—Negroes.—For the determination of the question, Who is a negro, mulatto, or person of color within statutes not specifically defining same, see the note to Wall v. Oyster, 31 L.R.A. (N.S.) 180.

7. A child is "colored" within the meaning of D. C. Rev. Stat. secs. 281, 282, 306, 310, 314, providing for separate free schools in this District for white and colored children, which has a proportion of negro blood of from one eighth to one sixteenth, although there are to be observed in her appearance no physical characteristics which afford ocular evidence suggestive of aught save the Caucasian.

No. 2202.  Submitted November 1, 1910.  Decided December 5, 1910.

HEARING on an appeal by the relator from a judgment of the Supreme Court of the District of Columbia, dismissing a petition for the writ of mandamus, after a hearing, to compel the School Board to admit the relator to a public school for white children.                                   *Affirmed.*

The COURT in the opinion stated the facts as follows:

The appellant, Isabel I. Wall, by her next friend, Stephen R. Wall, filed a petition for mandamus to compel the appellees, James F. Oyster, William V. Cox, Barton W. Everman, et al., who compose the board of education, to reverse the ruling of the superintendent of the Brookland White School, excluding petitioner therefrom, and to admit her as a pupil in said school.

The petition charges that petitioner was admitted to the Brookland White School at its opening in September, 1909, and shortly thereafter was excluded by the principal, on the ground that she was a "colored child." That the superintendent of public schools approved this exclusion, and the board of education affirmed his action. The petition first attacks the act of Congress providing for separate schools for white and colored children as unconstitutional, and then alleges that, if valid, she is not a "colored child" within the purview of said legislation, because her great-grandparents were a white man and a very light mulatto woman; her grandparents were a son of said great-grandparents and a white woman; and the parents of petitioner are the son of said grandparents and a white woman. She further says that she is a white child in personal

appearance, and is so treated and recognized by her neighbors and friends.

It appears from the answer to the rule to show cause, which sets out correspondence between the parents of petitioner and her counsel, and the board of education, that the latter determined, upon the statement of her lineage before given, that petitioner was a colored child. Subsequently, during these proceedings, the board, at a regular meeting for the purpose, determined that petitioner was a colored child, for the purpose of school classification, and denied her admission to the white school. It appears from the answer that there are separate schools for colored children which offer equal facilities with the white schools. A demurrer to the answer was overruled, and the petitioner entered a replication, in which she denies that she has a distinct and material admixture of colored blood, and that her father is a colored man, or that he is so recognized by his neighbors and friends.

The bill of exceptions sets out the evidence submitted on the hearing, and the conclusions of Mr. Justice Wright thereon.

The evidence on behalf of petitioner tended to show that the great grandmother of petitioner was a mulatto; the race of the great-grandfather being unknown. That the grandfather was a white man, the grandmother being the issue of the great-grandparents aforesaid. That the father was the child of the parents aforesaid and a white woman. That the associations of the grandfather were mainly with colored people, in a suburb chiefly occupied by colored people. That the father's associations were not largely with the colored race. Testimony on behalf of the respondents tended to show that the mother of petitioner's father was "colored," and that she and her husband had been buried in Arlington Cemetery, in a place set aside for colored officers of the volunteer army. That the father, mother, and sister of petitioner's father were always reputed to be "colored," and were yellow in appearance. That petitioner's father had, years ago, conducted a pool room in a colored neighborhood, that was frequented by colored people. The petitioner was produced before the court, but no evidence was

introduced as to her physical appearance. The following is extracted from the "finding and opinion" of the learned trial justice:

"There was to be observed of the child no physical characteristic which afforded ocular evidence suggestive of aught but the Caucasian. Her father, while of light complexion, presents to the eye racial characteristics which identify him of negro blood; her mother, formerly wife to a Mongolian, is taken to be white.

"The child's proportion of negro blood is one eighth or one sixteenth; the latter conceded, the former claimed, with support in the evidence. In the judgment of the court the difference can exert no effect in the outcome of this proceeding. \* \* \*

"It is to be concluded that the child is of negro blood of one eighth to one sixteenth; that her racial status is that of the negro. She is, therefore, 'colored,' according to the common meaning of the term, and the application for the writ of mandamus must be denied."

From the judgment dismissing the petition, this appeal has been prosecuted.

*Mr. Arthur A. Birney* and *Mr. John Ridout* for the appellant.

*Mr. Stanton C. Peele,* Assistant U. S. Attorney for the District of Columbia, for the appellees.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

A statute enacted in 1864, and afterwards carried into the Revised Statutes of the District, provided for the maintenance of separate free schools for white and "colored" children, affording like facilities and advantages to each. D. C. Rev. Stat. secs. 281, 282, 306, 310, 314. No definition is given of the word "colored," used in the act.

We think it unnecessary to enter upon a discussion of the power of Congress, which exercises all the functions of a state legislature in the District of Columbia, to provide for the separation of white and colored children in the public schools. That question has been effectually settled by the Supreme Court of the United States. *Plessy* v. *Ferguson,* 163 U. S. 537–551, 41 L. ed. 256–261, 16 Sup. Ct. Rep. 1138.

There is nothing in the objection to the statute that it does not expressly provide that notice and hearing shall be given to persons seeking admission to the schools before they can be refused enrolment in one or the other. *Paulson* v. *Portland,* 149 U. S. 30–38, 37 L. ed. 637, 13 Sup. Ct. Rep. 750; *Allman* v. *District of Columbia,* 3 App. D. C. 8–25.

The statute does not prohibit notice or hearing, and it appears that both were given in this case.

Congress having failed to define the meaning of the word "colored," the duty was necessarily devolved, in the first instance, at least, upon the board of education to determine what children are white and what are colored whenever that question shall arise in a particular case. The powers conferred upon the board in respect of the management and control of the schools are general, and contemplate the exercise of a broad discretion. *United States ex rel. Nalle* v. *Hoover,* 31 App. D. C. 311, 320. As was said in that case: "The extraordinary writ of mandamus will not be granted to correct mere errors of judgment committed by the board so long as it acts within the authority conferred by statute."

The statute in this case conferred no authority upon the board to exclude a white child from a white school, or a colored child from a colored school. Either act would be in excess of its jurisdiction. It is plain that the board did not intend to act arbitrarily or unjustly in excluding petitioner from the white school. Upon substantially undisputed facts, it determined the question as one of law simply. If mistaken in its construction of the law, its action was without authority and is subject to judicial review. *American School* v. *McAnnulty,* 187 U. S. 94–109, 47 L. ed. 90–96, 23 Sup. Ct. Rep. 33;

*Roberts* v. *Valentine*, 13 App. D. C. 38–46, s. c. 176 U. S. 221–230, 44 L. ed. 443–446, 20 Sup. Ct. Rep. 376.

The learned trial justice reviewed the action of the board, but, concurring in their interpretation of the law, dismissed the petition. His conclusion is thus clearly stated:

"That the common use of the word throughout the United States is in nowise significant of mere complexion is quite definitely established by considering the universal habit of the people in their unalterable failure to apply it to the Indian, who is red, the Mongolian, who is yellow, or to the Malay, who is brown; its application to one of these unfair complexions is not any time to be heard; to those of negro blood alone it is ever found to be suited; and then, not depending for the propriety of its application upon a shade of particular blackness, but rather upon an admixture of a particular racial blood,—the negro. Whether complexions appear distinctly black or approaching toward the fair by gradations of shading is all one; if there be physical touches, whether of shade, hair, or physiognomy telling of negro blood, such a one is held by the people to be "colored" despite his color or want of color. In confirmation of the accuracy of this conception, one need appeal to no mentor beyond the honesty of his own observations day by day.

"While there is therefore no good argument nor any other kind of a good consideration which opposes the conclusion that, no matter what the complexion, admixture of negro blood makes one 'colored' if it manifests itself in racial traits which identify its presence to the eye of the observer, there remains to be considered whether, if negro blood be present, mere fairness alone, of even great degree, must of necessity enact the subject 'white.' That gradations in shading toward black, or gradations in shading toward fairness, are of very insignificant concern in determining whether one be colored, has already been observed. The sense of sight is but one avenue for the conveyance of information upon the subject of racial identity to the mind of the investigator. Actual color seems to the public mind to be important only as one of the several evi-

dences which, if sufficiently pronounced, serve to identify the subject as of the negro race; and this consideration, that is to say, the consideration of racial status, seems to my mind to measure an ultimate conception to which the mind of the people has arrived. It is this,—putting away for the moment particular instances which might present more refined complications,—persons of whatever complexion, who bear negro blood in whatever degree, and who abide in the racial status of the negro, are 'colored' in the common estimation of the people.

"The child at bar has acquired no racial status personal to itself; its status, of necessity, is that of its father; his, and that of his paternal ancestors, has, as is conceded, been always that of the negro; he himself has thus been commonly known and identified, his business to the extent proven, proprietor of a negro pool room, conforming."

Counsel for the petitioner concede that the word "colored" must be given its common or popular signification, but contend that, in such signification, "negro physical characteristics and negro blood must combine in one to render him colored." In aid of this contention it is to be remembered that the learned trial justice had found that "there was" to be observed of the child no physical characteristic which afforded ocular evidence suggestive of aught save the Caucasian." He declined, however, to accept this delusive test of race, and based his conclusion that the petitioner is "colored" upon the fact that she has a proportion of negro blood of not more than one eighth and not less than one sixteenth. There has been a great deal of legislation by the States relating to negroes, mulattoes, and colored persons, in very little of which has there been any attempt to define the sense in which the several terms are to be understood. In some States "colored persons" are declared by the statute to be those having a certain proportion of negro blood in their veins,—in some instances one fourth; in some one eighth; in some one sixteenth; and in others any admixture. It is unnecessary to review these several statutes or the

decisions founded on them, as they can shed no light upon the question as here presented.

In the absence of a definition in our own statute, we are compelled to ascertain the popular meaning of the word "colored." As early as 1820, Mr. Justice Story declared that the word had "acquired as definite a meaning as negro, mulatto, etc.," though it was not necessary in the case before him to express more definitely what that meaning was. *United States* v. *La Coste,* 2 Mason, 129–141, Fed. Cas. No. 15,548. The latest decisions in which the meaning of these terms, "negro," "mulatto," "octoroon," "colored," has been considered, are by the supreme court of the state of Louisiana. *Lee* v. *New Orleans Great Northern R. Co.* (1910) 125 La. 236, 51 So. 182; *State* v. *Treadaway* (1910) 126 La. 300, 52 So. 500.

The first case arose under the statute providing for the separation of the "white and colored races" in railway trains. The evidence showed that the father of the children was undoubtedly a white man. The mother was of mixed blood, the extent of which was not proved. It was held that the word "colored" in its popular meaning included all persons having an appreciable admixture of negro blood. The supreme court of Ohio came to the same conclusion in 1859. *Van Camp* v. *Board of Education,* 9 Ohio St. 406–413.

In the later Louisiana decision, cited above, the case was the prosecution of an octoroon—a person having one eighth or less of negro blood—for concubinage with one of the white race, under a statute making such relation between a person of "the Caucasian or white race and one of the negro or black race" a felony. The meanings of negro, mulatto, octoroon, and colored person were exhaustively discussed. All agreed that in popular meaning a "colored person" was one who had an appreciable admixture of negro blood, but the majority of the court held that unless black, that is, of predominating negro blood, one was not of the negro or black race in the sense of the statute. The views of the majority were thus expressed by Mr. Justice Provosty: "There is a word in the

English language which does express the meaning of a person of mixed negro and other blood, which has been coined for the very purpose of expressing that meaning, and because the word 'negro' was known not to express it, and the need of a word to express it made itself imperatively felt. That word is the word 'colored.' The word 'colored,' when used to designate the race of a person, is unmistakable, at least, in the United States. It means a person of negro blood, pure or mixed; and the term applies no matter what may be the proportions of the admixture, so long as the negro blood is traceable."

While this view accords with our own observation of the popular meaning of the word "colored," we would not rest our conclusion upon such an uncertain foundation.

The most reliable sources of information in this regard are the dictionaries, which are universally accepted as the best exponents of the popular meaning of the words of the language. It is sufficient to say, without quoting from them, that these show that the word "colored," as applied to persons or races, is commonly understood to mean persons wholly or in part of negro blood, or having any appreciable admixture thereof. See Webster's International; the Standard; and the Century Dictionary.

We are of the opinion that the board of education correctly interpreted the statute, and that the learned justice was right in dismissing the petition.

It has been urged that a cruel hardship will be inflicted upon the petitioner by the conclusion at which we have arrived. It may be, however, that greater evils would result from a different one. Be that as it may, our province is to interpret legislation, not to enact it.

The judgment will be affirmed, with costs.     ' *Affirmed.*