## FLOOD v. NEWS AND COURIER CO.

1. LIBEL.—Publishing a white man in a newspaper as "colored" is libellous *per se.*
2. THE XIII., XIV., XV. AMENDMENTS TO CONSTITUTION OF UNITED STATES, do not affect the social relation of the white and negro races, but it is the same as before the adoption of the amendments.

Before DANTZLER, J., Charleston, March, 1904. Reversed.

Action by Augustus M. Flood against *News and Courier Co.* From order sustaining demurrer, plaintiff appeals.

*Messrs. Young & Young,* for appellant, cite: *It is libelous per se to publish a white man as a negro:* 18 Ency., 2 ed., 861, 866, 867, 906, 913; Cheves L., 194; Dudley, 303; 1 N. & McC., 184, 347; 4 McC., 317; 4 So. R., 71; 38 S. C., 533; Crim. Code, 293, 479, 480; Code, 1902, 2664, 2158, 1231; 1 Woods, 537; 3 Woods, 367; 119 Fed. R., 381; 163 U. S., 544; 100 U. S., 306; 163 U. S., 544; 16 S. C., 397. *Amendments of U. S. Con. do not affect the question:* 38 S. C., 533; 109 U. S., 3; 100 U. S., 303, 313; 109 U. S., 537.

*Messrs. Mitchell & Smith,* contra, cite: *Use of word "colored" in publication without further damages is not libel per se:* 18 Ency., 865, 866; 4 Cranch, 235; 53 N. C., 184; Code, 1902, 2821; 104 La., 141.

March 15, 1905. The opinion of the Court was delivered by

MR. CHIEF JUSTICE POPE. The appeal here involves the consideration of the complaint and the demurrer thereto. It will be necessary, therefore, to reproduce the complaint, which is, omitting the caption, as follows:

"I. That the said defendant is a corporation under the laws of the State of South Carolina.

"II. That this plaintiff is a white man of pure Caucasian blood, and is and at the time hereinafter mentioned was a citizen of the city of Charleston, county and State aforesaid, where he has always enjoyed the respect and confidence of his white fellow-citizens, the same having been of value to plaintiff in his business, and a source of pride and pleasure to him in his social life.

8—71

"III. That the defendant was at the time hereinafter mentioned the publisher and proprietor of *The News and Courier,* a newspaper published in the city, county and State aforesaid, of large circulation both in the said city and State.

"IV. That the defendant did, on the 9th day of October, 1903, wilfully and maliciously compose and publish in said newspaper the false and defamatory matter concerning the plaintiff, as follows, to wit:

" 'A SUIT FOR DAMAGES.—A. M. Flood wants *one thousand dollars* on account of being injured by trolley car.

" 'Augustus M. Flood, colored, through attorneys, Young & Young, filed suit yesterday, in the Court of Common Pleas against the Charleston Consolidated Railway, Gas and Electric Company for damages in the amount of one thousand dollars for alleged injuries received from being injured by a street car operated by the defendant company.

" 'The petition states that the plaintiff, on the night of July 9, 1903, in the pursuit of his business, was crossing over King street, between Line and Columbus streets, and as he reached the track, the said defendant carelessly, negligently and wilfully omitted to give any signal of the approach of the car, by reason of which the plaintiff was unaware of its approach, and was struck by the car and knocked down with such force and violence that his cheek bone was broken and his leg badly bruised. That thereby the plaintiff was put to great pain and was prevented from going on with his business, and was otherwise injured and compelled to expend money for medical attention and nursing to his damage.

" 'To the above complaint, the defendant company, by their attorneys, Messrs. Mordecai & Gadsden, have filed an answer denying certain allegations made by the plaintiff, and allege that the injuries claimed to have been received by the plaintiff were caused by his negligence and carelessness in attempting to cross over King street about midway between Line and Columbus streets, at night, immediately in front of one of the cars of the defendant company, and that but for

such contributory negligence on the part of the plaintiff the said accident would not have happened.'

"V. That the defendant by such publication falsely called this plaintiff *'colored,'* and so falsely published him and meant to publish him as and declare him to be a negro, which was false and defamatory and tends to exclude him from society, and by reason of said false and defamatory publication this plaintiff has been injured in his reputation and hurt in his feelings to his damage ten thousand dollars.

"Wherefore, plaintiff demands judgment against the defendant in the sum of ten thousand dollars and costs of this action."

To this complaint the defendant interposed the following demurrer:

"The defendant above named demurs to the complaint herein on the ground that it appears upon the face of the complaint that the complaint does not state facts sufficient to constitute a cause of action, in that it doth not appear upon the face of said complaint that the language used of and concerning the plaintiff was in anywise defamatory or libellous, or that he has suffered any legal damage therefrom, inasmuch as the only language in said complaint alleged and claimed to be libellous and defamatory is the word 'colored,' and the only damage alleged and claimed is that resulting from the application of said term to the plaintiff; whereas, under the provisions of the XIII., XIV. and XV. amendments to the Constitution of the United States, and of the provisions of the Constitution and statutes of South Carolina, the use of said word 'colored' in application to any one is not libellous nor defamatory, nor can any legal damage or cause of action arise from such application."

This demurrer being sustained by the presiding Judge, the plaintiff interposed the following grounds of appeal:

"I. That his Honor erred in holding that the appellation 'negro' or its equivalent 'colored,' when applied to a white

man, is not libellous *per se;* whereas, it is submitted such a term when applied to a white man is libellous *per se.*

"II. That the law in this State, before the adoption of the XIII.; XIV. and XV. amendments to the Constitution of the United States, being that the term 'negro' or its equivalent 'colored,' when applied to a white man, was libellous *per se,* in that it tended to exclude him from society, his Honor erred in holding that this has been changed and that the negro's social status has been changed by the said amendments; whereas, it is submitteed that only the negro's legal and political status has been affected thereby."

Libel is defined as follows, on page 661 of the 18th volume of American and English Encyclopedia of Law : "A libel is a malicious defamation, expressed either by writing or printing, or by signs, pictures, effigies, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue or reputation, or publish the natural or alleged defects of one who is alive, and thereby expose him to public hatred, contempt, ridicule or obloquy, or cause him to be shunned or avoided, or to injure him in his office, business or occupation."

The only question presented by this appeal is, Is it libellous *per se* to publish a white man as a negro? The appellant insists that the authorities in this State sustain the proposition that such a publication in a newspaper is a libel *per se.* He alleges with force that any defamation in these words is of such a character as to expose him to an injury to himself as a member of society, and that in such case no special damages need be alleged or proven. As is said in the A. & E. Ency. of Law, at page 966 : "Written words tending to diminish the respectability of the person to whom they relate, and to expose him to disgrace and obloquy, although they do not impute the commission of a crime, are libellous and actionable, although no special damages are alleged or proven."

To call a white man a negro, affects the social status of the white man so referred to. These words were so construed by cases in the reports of our State. *Eden* v. *Legare,* 1 Bay, 171, which was decided in 1791; the Court there held: "But the Court resolved that the words in themselves, that is, calling a white man a negro or mulatto, which is the same, were, in this country, actionable." In *Woods* v. *King,* 1 N. & McC., 184, decided in the year 1818, calling the plaintiff's wife a mulatto, was held actionable *per se.* So in the *State* v. *Farley,* 4 McC., 317, 320, the Court said: "If a man deliberately or maliciously publish anything concerning another which renders him ridiculous or tends to hinder others from associating or having intercourse with him. an action lies." In *Strauder* v. *West Virginia,* in the 100 U. S., 303, 306, Mr. Justice Strong, in delivering the opinion of the Court, said: "The colored race as a race was abject and ignorant, and that condition was unfit to command the respect of those who had superior intelligence."

When we think of the radical distinction subsisting between the white man and the black man, it must be apparent that to impute the condition of the negro to a white man would affect his, the white man's, social status, and in case any one publish a white man to be a negro, it would not only be galling to his pride, but would tend to interfere seriously with the social relation of the white man with his fellow white men; and to protect the white man from such a publication, it is necessary to bring such a charge to an issue quickly. In *Strauder* v. *West Virginia, supra,* the Court held that these amendments XIII., XIV. and XV. were designed to accord the members of the negro race the same protection in life, liberty anad property which was already enjoyed by the white race. And nowhere does the Court in that case refer to the social relations of each race.

What does society mean in this connection? Does it not mean the class with which he mingles; the class from which, if a man marries, he selects his wife; the class of people with

whose children his children go to school? The Century Dictionary and Encyclopedia defines society as "Fellowship, companionship, company. Those persons collectively who are united by a common bond of neighborhood and intercourse, and who recognize one another as associates, friends and acquaintances." Webster says: "Society is the relationship of men to one another when associated in any way. Companionship; fellowship; company." Again, "The persons collectively considered, who live in any region or in any period; any community of individuals which unite together by a common bond of nearness or intercourse; those who recognize each other as friends and acquaintances."

The statute law of this State forbids the association of the two races in such way as excludes the negro from white society, and *vice versa.* By the miscegenation statutes, the intermarriage of the two races is forbidden and made a crime. (Criminal Code, 293; Civil Code, 1902, 2664.) By statute the railroads of the State are required to furnish separate coaches for the two races, and it is a misdemeanor for any railroad employee to permit a colored passenger to occupy the car for white people, or a white passenger the car for colored people. (Criminal Code, 479, 480; Civil Code, 1902, 2158.) White children and colored children are forbidden to attend the same school. (Civil Code, 1231.) In *Smith* v. *Chamberlain,* 38 S. C., 529, 533, 17 S. E., 371, the Circuit Judge, in charging the jury, said, "Among the citizens of South Carolina we have two distinct races. Before the law they are equal. The colored race, in our courts of justice, stand on the same plane as the white race. Our laws bear equally on all, without regard to race, color or previous condition. Our social conditions, however, are very different. Friends, companions and neighbors must be of our own choice. These relations and associations the law does not undertake to make or regulate for us. If we do not wish to associate with one class of society, there is no law that I know of which compels us to do so." The Su-

preme Court sustained the charge of the Circuit Judge, but that is not all.    In the case of *Spotorno* v. *Fourichon,* 4th Sou. Rep., 71 (La.), decided in 1888, the Court held: "Under the social habits, customs and prejudices prevailing in Louisiana, it cannot be disputed, that charging a white man with being a negro, is calculated to inflict injury and damage.    We are concerned with these social conditions simply as facts.    They exist, and for that reason we deal with them.    No one could make such a charge, knowing it to be false, without understanding that its effects would be injurious, without intending to injure."    Also, the case of *Upton* v. *Times-Democrat Publishing Co.,* 22 Sou. Rep., 900, decided in 1900 (La.), in point.    The plaintiff in this case was a white clergyman.    The reporter on the *Times-Democrat* described him as "a cultured gentleman," which by error of the telegraph company was changed to a "colored gentleman," and the editor of the paper changed to "negro." In this latter form the article appeared next morning.    A day afterwards the fullest retraction and apology appeared and in as prominent a position as the original article.    After the plaintiff got a verdict, and on appeal, the Court held: "The word complained of was provoking to an extreme degree.    ˙Inserted as it was in one of the daily papers, it was enough to arouse the most profound indignation of the most patient man.    Plaintiff naturally at once took steps to find out how it was that he was referred to as not being a white man. Taking up the facts for review * * * we may as well say here, we take it that the change from 'colored gentleman' to 'negro,' as made, presents no ground for complaint.    One expression ('colored gentleman') was as objectionable as the other ('negro')."    A full retraction was made in the next morning's paper, but retraction and apology, even when timely made, are not all that is needful to relieve a publishing company from liability for injury resulting from oversight or negligence, even where there is no malice or evil intent, which may give rise to liability in damages.    A newspaper

would yet be liable if an injurious untruth should find its way into its columns, though by the merest accident. The law seeks to protect the innocent, who has been injured by libellous reports. The fact that a management may be all that can be expected, to guard against unfortunate accidents, is not, in itself, a protection against damages and a sufficient defense.

2. Have the amendments to the United States Constitution numbered XIII., XIV. and XV. had any effect to change the social differences between the white man and the negro man? Here is the text of those amendments.

2    The XIII. amendment is as follows: "Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the parties shall have been duly convicted, shall exist within the United States, nor in places subject to their jurisdiction." The XIV. amendment is as follows: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the law." The XV. amendment is as follows: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or any other State on account of race, color or previous conditions of servitude."

Now, it must be apparent from consulting the texts of these amendments, that there is not the slightest reference to the social conditions of the two races, and nothing can be imported into these amendments to give any such effect. All take pleasure in bowing to the authority of the United States in regard to these three amendments, but we would be very far from admitting that the social distinction subsisting between the two races has been in any way affected.

In *Plessy* v. *Ferguson,* 109 U. S., page 537, the Court held:
"The object of the fourteenth amendment was undoubtedly
to enforce the absolute equality of the two races before the
law, but in the nature of things it could not have been in-
tended to abolish distinction based upon color, or to enforce
social as distinguished from political equality, or a comming-
ling of the two races upon terms unsatisfactory to either.
The argument also assumes that social prejudices may be
overcome by legislation, and that equal rights cannot be
secured to the negro except by an enforced commingling of
the two races.   We cannot accept this proposition.   If the
two races are to meet upon terms of social equality, it must
be the result of natural affinities—a mutual appreciation of
each other's merits and a voluntary consent of individuals.
As was said by the Court of Appeals of New York, in *People*
v. *Gallegher,* 93 N. Y., 438, 448, 'This end can neither be
accomplished nor promoted by laws which conflict with the
general sentiment of the community upon whom they are
designed to operate.   When the government, therefore, has
secured to each of its citizens equal rights before the law, and
equal opportunities for improvement and progress, it has
accomplished the end for which it was organized and per-
formed all functions respecting social advantages with which
it is endowed.'   Legislation is powerless to eradicate racial
instincts or abolish distinctions based upon physical differ-
ences, and attempts to do so can only result in accentuating
the difficulties of the present situation.   If the civil and
political rights of both races be equal, one cannot be inferior
to the other, civilly or politically.   If one race be inferior
to the other socially, the Constitution of the United States
cannot put them on the same plane."

We, therefore, hold that these three amendments to the
Federal Constitution have not destroyed the law of this
State, which makes the publication of a white man as a negro
anything but libel.

The judgment of this Court is, that the judgment of the Circuit Court be reversed where it sustained the demurrer in this case, and the action is remanded to the Circuit Court for such other proceedings as may be in accordance with law.

MESSRS. JUSTICES GARY, JONES *and* WOODS *concur in the result, as the complaint alleges that the publication was wilful and malicious.*