8801

TUCKER v. BLEASE *ET AL.*

(81 S. E. 668.)

CIVIL RIGHTS. PUBLIC SCHOOLS. SEGREGATION OF PUPILS.

1. In view of Const., art. III, sec. 33, declaring void the marriage of a white person with a negro or mulatto having one-eighth or more negro blood, the child of a union of a white person and one having less than one-eighth negro blood is entitled to exercise all the legal rights of a white man, except those arising from a proper classification, when equal accommodations are afforded.

2. While the child of a white person and one having less than one-eighth negro blood is entitled to exercise the rights of a white man, in view of Const., art. III, sec. 33, authorizing the marriage of such persons, school trustees, under Civil Code 1912, sec. 1761, subd. 3, providing that the trustees shall have authority and it shall be their duty to suspend or dismiss pupils when the best interest of the schools make it necessary, may, upon providing a school for children of this class, distinct from both the white and negro schools, suspend such child from the white schools when for the best interest of the other white pupils, who would be withdrawn if it was allowed to remain, notwithstanding section 1780, declaring that it shall be unlawful for pupils of one race to attend the schools provided for another, and Const., art. II, sec. 7, providing for separate schools for whites and negroes.

Petition for *certiorari* in the original jurisdiction.   Petition dismissed.

Application by G. W. Tucker for a writ of *certiorari* against Cole. L. Blease and others, constituting the board of education in and for the State of South Carolina, to review

FOOTNOTE—On the question of the right of an educational, charitable, or religious institution to exclude person on account of race or color, see note in 24 L. R. A. (N. S.) 447.

the dismissal of Herbert Kirby and others from the Dalcho public school. Order affirmed.

The petition was as follows:

"The petition of the undersigned, G. W. Tucker, respectfully shows to the Court:

I. That the Honorable Cole. L. Blease, by virtue of his office, J. E. Swearingen, D. M. O'Driscoll, C. J. Ramage, D. W. Daniel, A. G. Rembert, Lueco Gunter, D. T. Kinard and A. J. Thackston, are, and constitute the State board of education in and for the State of South Carolina, and at the times hereinafter mentioned, were performing their duties and acting in their capacity as members of said board.

II. That heretofore, to wit, on or about the 24th day of January, 1913, the wards of your petitioner were, and for a number of years prior thereto had been, in attendance upon the white schools in and for the county of Dillon, and were in such capacity pupils on the date mentioned, in the Dalcho public school, in said county, when they were, without cause, summarily dismissed from the said school and prohibited from further attending the same.

III. That thereafter, to wit, on the 29th day of January, 1913, your petitioner filed his petition with the county board of education in and for the county of Dillon, asking that his said wards be reinstated in said school, and be allowed to attend thereon, a copy of which petition is as follows:

"The petition of the undersigned, George W. Tucker, respectfully shows to the board:

I. That Dalcho public school is a school duly formed and organized under and by virtue of the public school law of the State of South Carolina, and John W. Coleman, Lawrence E. Dew and J. F. Williams, are the duly appointed and acting trustees thereof. That your petitioner has been duly appointed guardian, by the probate Court for Dillon county, of the person and estate of the above named children, Herbert Kirby, Eugene Kirby and Dudley Kirby, being four-

teen, twelve and ten years of age, respectively. And at the present time and since such appointment he has had the children in his custody and charge.

II. That upon the said children becoming old enough to enter the public schools of the State they immediately began attendance at the white public schools. The older one, Herbert Kirby, attending the white public school at Dothan, in the county of Dillon, for a period of about two sessions; that about four years ago the parents of the said children moved to the town of Dillon and the said children attended the public school for white children in the town of Dillon for two sessions; that upon the death of the parents of the said children your petitioner, as guardian, took them to live with him and placed them in the public school for white children at Dalcho, which said school they have been attending for two sessions and a part of the third.

III. That the wards of your petitioner have been attending the said public school at Dalcho during the present session; that they have always properly conducted themselves, and were in the proper pursuit of their duties as pupils of the said school up to and inclusive of Friday, January the 24th, when the said children were by the trustees above named summarily and without cause and without the children or guardian being given a hearing, dismissed from the school and notified that they would not be received back into the school.

IV. That the said children are entitled to attend the said school; that they have all the time been properly dressed, have properly conducted themselves, and there was no excuse for their being dismissed; that they are of the age that it is of the utmost importance that they should attend school to prepare them for their duties in life; that there is no other convenient school to which your petitioner can send the said children and by their being disbarred from the said school great and irreparable damage and injury will be done to them.

Wherefore, your petitioner prays, that this board do issue its order requiring the said John D. Coleman, Lawrence E. Dew and J. F. Williams, constituting a board of trustees for Dalcho public school, to show cause before your honorable board why the said children should not be forthwith reinstated in the said school. G. W. Tucker. Gibson & Muller, Petitioner's Attorneys."

Which petition was duly verified, and thereupon the county board issued its order authorizing and directing the board of trustees to show cause why the relief prayed for should not be granted.

IV. That the said cause came on for a hearing and the testimony was taken, upon the conclusion of which the said board filed their decision thereon, sustaining the acts of the board of trustees in dismissing the wards of your petitioner, but requiring the said trustees to furnish school facilities for children of the class to which it was claimed the wards of your petitioner belonged.

V. That within the time provided by the rules of the State board of education your petitioner duly appealed from the finding of said board, and asked that the same be reversed upon the following grounds, to wit:

(I) "Because the county board was in error in holding that according to the testimony produced at the hearing, the board of trustees of Dalcho public school district had the power and authority under the law to dismiss from the said Dalcho public school the wards of petitioner, Herbert Kirby, Eugene Kirby and Dudley Kirby.

(II) Because the county board of education was in error in holding that section 1761 of vol. I, of the Code of Laws of South Carolina of 1912, gave the said trustees power and authority in their discretion to dismiss or suspend from the public school without legal cause any child or children. The error being that the law distinctly provides for a school for the races, white and black, shall be separate, and there being no testimony in the case at bar sufficient to establish the fact

that the children in question were the children of the colored race, and there being no testimony showing, or tending to show, that the children in question acted improperly or disobeyed the rules and regulations of the school, they had the right to attend the white public school, and the action of the board in dismissing them was arbitrary and not in accordance with law.

(III) Because the county board of education was in error in holding and finding that the return of the trustees in this proceeding shows that the action taken by them was for the best interest of the school district and that the allegations of the return were sustained by the testimony. The error being that the testimony shows conclusively that there was no reason why the said children themselves should have been dismissed, but, on the contrary, shows that they were children of good behavior and intelligence, and there was no valid reason why they should have been so dismissed.

(IV) Because the law of the State of South Carolina with regard to the free public school provides that separate schools shall be maintained for the white and colored races, and the testimony shows conclusively that the children did not belong to the colored race, but were white and associated with white people. Their dismissal from the school, therefore, amounts and amounted to a denial to them of the benefit of the public school guaranteed to all by law, and the board was in error in not so holding.

(V) Because the testimony shows that the children in question own considerable property in the county and pay taxes thereon, including the school taxes levied in the district, and hence have the right to enjoy the benefit to be derived therefrom, and the county board of education was in error in sustaining the action of the trustees of the school district in depriving them of this right.

(VI) Because the board were in error in holding and providing that the trustees should provide separate educational facilities for the wards of petitioner and other children of

like situation in the district, the error being that the testimony shows that there are only a very few, or no other children, of the same class, as the wards of petitioner, in the district and such facilities could not be put into practical operation, and hence amounts to nothing more than depriving the children of their rights under the law.

(VII) Because the Constitution provides that any person with not over one-eighth of negro blood in him shall be in contemplation of law a white person and entitled to the privileges of such person, and the statutes provides that white children shall attend the white school, and the testimony showing that the children in question here were white and were of proper character to attend the white school, it was error on the part of the board to sustain the trustees of the school district in depriving them of this right.

(VIII) Because the uncontradicted testimony shows that the parents of the wards of petitioner have always associated with white people, that the father owned in his lifetime considerable property in the county and exercised all the privileges of white citizenship; that both parents were members of the first white Baptist church of Dillon; that some of the children were members of that church and others of Catfish Baptist church, also a church of white people; that the children have been attending the school in question for several sessions; that some of them attended the white public school in the town of Dillon, and other white schools in the county; all of which establishes conclusively that the children were recognized as and associated with white people, and the board was in error in not so finding and in refusing to allow them to re-enter the school.

(IX) Because the testimony shows that on several occasions the trustees of the school district have attempted to provide what they designate as separate facilities for education of children of a class alleged to be of the same class as the wards of petitioner, but in such attempts have resulted in failure, and if petitioner's wards have no other oppor-

tunity of obtaining the rights of a school to which they are entitled they will be entirely deprived of their rights and required to grow up in ignorance.

(X) Because there is no sufficient testimony to sustain the action of the board of trustees, such testimony as was offered being largely from the trustees themselves and tenants on their farms and from few, if any, of the landowners in said school district, all of which shows mere arbitrary action on the part of the trustees not supported by the public sentiment of the community, and the county board was in error in not so holding."

VI. That upon the hearing of said cause by the said State board of education, the said board, without making any formal written decision in the matter, notified your petitioner, through his attorneys, that the said finding of the county board was affirmed and the appeal was, therefore, dismissed.

VII. Your petitioner further respectfully submits that the State board of education erred as a matter of law in holding and deciding:

(1) That the county board of education was not in error in holding that according to the testimony produced at the hearing the board of trustees of Dalcho public school district had power and authority under the law to dismiss from the said Dalcho public school the said wards of your petitioner.

(2) In holding that the said county board of education was not in error in finding that section 1761 of vol. I of the Code of Laws of South Carolina of 1912, gave the said trustees power and authority, in their discretion, to dismiss or suspend from the public school without legal cause any child or children when the error was clear, in that the law distinctly provides for a school for the races of white and black, and that they shall be separate and distinct, and there being no testimony in the case sufficient to establish the fact that the children in question were children of the colored race,

22—97

and there being no testimony tending to show that the children in question acted improperly or disobeyed the rules and regulations of the school, they had the right to attend the white public school.

(3) That the State board erred in not finding the county board of education in error in holding and finding that the return of the trustees in the proceeding shows that the action taken by them was for the best interest of the school district, and that the allegations of the return were sustained by the testimony; the error being that the testimony shows conclusively that there was no reason why the said children themselves should have been dismissed; but, on the contrary, shows that they were of good behavior and intelligence, and there was no valid reason why they should have been dismissed.

(4) Because the State board of education erred as a matter of law in holding that the trustees of school districts in any district could provide as many white or colored schools as they saw fit and could require any pupil in said district to go to any specific school without regard to the rights, convenience or qualifications of said child.

(5) Because the Constitution provides that any person with not over one-eighth of negro blood in him shall be in the contemplation of law a white person and entitled to the privileges of such persons; and the statutes provide that white children shall be entitled to attend white schools, and the testimony showing that the children in question were white and of proper character to attend the white schools, and it was, therefore, an error, as a matter of law on the part of the State board of education, to sustain the trustees of said school district in depriving the said children of this right.

(6) Because the uncontradicted testimony shows that the parents of the wards of the petitioner have always associated with white people; that the father owned, in his lifetime, considerable property in the county and exercised all the

rights and privileges of white citizenship; that both parents
were members of the first white Baptist church of Dillon;
that some of the children were members of that church and
others of Catfish Baptist church, also a church for white peo-
ple; that the children have been attending the school in ques-
tion for several sessions, and some of them attended the
white public school in the town of Dillon and other white
schools of the county; all of which established conclusively
that the children were recognized as and associated with
white people, and it was an error of law on the part of the
State board of education to hold, when both under the Con-
stitution and by association, that the said children were
white, that they were not entitled to attend the white schools
in said district.

(7) Because the State board erred in sustaining the find-
ing of the county board that separate school facilities should
be provided for the children in question, when the testimony
shows conclusively that no such facilities could be provided,
and that the school in question which the children had been
attending was most convenient and most beneficial for them,
and in so sustaining the said finding deprived them of the
rights to which they are entitled under the law.

VII. The petitioner further shows, that because of the
errors of law above set forth, his wards have been deprived
of their legal rights, and he has no other remedy save and
except that this Court grant to him a writ of *certiorari* to the
said State board of education, directing the said board to
send up the record in said cause to the Supreme Court of the
State of South Carolina to review the same as provided by
law.

Wherefore, your petitioner respectfully prays that a writ
of *certiorari* be issued out of this Court to the said State
board of education to the end that the Supreme Court of the
State of South Carolina may be informed of all of the pro-
ceedings had in said matter, and may investigate the legal
questions arising therein and determine the same in accord-

ance with law.  Geo. W. Tucker, Petitioner.  Gibson & Muller, Attorneys of Petitioner."

The synopsis of the testimony prepared by petitioner's attorney is as follows:

"John D. Coleman, being duly sworn, says: 'I am chairman of the board of trustees, and have held the position for about 14 years; that the facts set up in the petition are true; that the matter was brought to the attention by other children in the class attempting to come in and the petition that was filed with the trustees.  The names to the petition are citizens of the community and patrons, and I know a majority of them personally.  Upon the petition being filed, we called a meeting of the board of directors.  Every phase was gone over, and we decided it was for the best interest of the school to dismiss them.  The children nor their guardian were notified until the day they were dismissed. We had a talk afterwards with Mr. Tucker, and gave the reason for dismission, "that the children were not white." Mr. Tucker stated that they had never been considered anything but white.  It is generally known that they are not pure Caucasian blood.  I knew their father for 22 or 23 years, but have only seen the children going to and from school.  If these children were allowed to attend school others of the class would seek to come in, and our position was that we could not exclude others without these.  Since I have been a member of the board of trustees, the trustees have been paying the tuition of children of this class anywhere they could get in school.  We also established a separate school, had three teachers, one taught 2 or 3 years, and the other two a year each.  The last one stayed only a week. It was not successful, and we decided to adopt the old plan. We are willing to establish a separate school.  There are 10 or 12 in the class.'

"On cross-examination, he testified that they were neither white nor black, but were Croatan or mulatto.  'In dismiss-

ing them we did not investigate what mixture of blood was in them. We didn't have to do that. I have known that they are mixed for 20 years, from what I have heard people say. I knew the mother of John Kirby and his brothers and sisters; most of them were only half brothers and sisters. John Kirby was the oldest of these children. Eliza Foxworth was their mother. John Godbolt was the father of John Kirby, but I could not give the lineage further back. The alleged taint in the blood came in through the Godbolts, there being two separate and distinct families of this name. From John's appearance we judge that the mixture was not very far back. These children have the appearance of white children. We had general information on which we acted in reaching this conclusion. I am a member of Catfish Baptist church, of which some of the Kirby children are members. George Tucker is not a member of this church, but goes there some time. Mr. Tucker owns some property in the school district. The children own in the county a tract of land containing 300 acres, and perhaps own some property in the town of Dillon. This is the third session they have been in school, and I have never heard of them giving any trouble. They are always properly clad as far as I know, and are average pupils. Ed Kirby went to Dalcho school about 10 years ago. It has been at least 3 years since we have attempted to have a separate school. No provision was made for these children except that we offered them the same chance we made others.'

"On redirect examination, he testified that John Kirby had sisters and half brothers who associated with him who were not white. 'Mrs. Kirby had one half brother and sister who were colored. John Kirby associated with colored people. We told Mr. Tucker if he could get enough children of this class we would build another schoolhouse. As there seemed to be such a few, it would not justify us to do so. He said he would help us, but would not patronize it. Some years ago people of this class had a space set apart for

them in Catfish Baptist church, as did also the negroes. We told Mr. Tucker on more than one occasion that we had raised no objection to his children. I have had John Kirby work for me, and have associated with Mr. Tucker in a business way. I have known Mr. Tucker to have one of the half brothers to live with him and work for him. There are 80 some odd children in the Dalcho district and 10 or 12 of this class. When these children first entered, because of Mr. Tucker, we thought it a business thing to do to let them go to school, unless their going would in some way become detrimental. We finally decided it was not for the best interest, because other children of the class would come in. Four others attempted to enter, some of whom were a good deal darker. We thought it was not best that the Kirby children should attend school, as the patrons would not want their children raised up with them.'

"J. F. Williams, being sworn, testifies : 'I have lived in this community for 18 years, and have been a trustee since last spring. I know the Kirby children and knew their father. I have always heard that he was not clear-blooded. Mr. Coleman's statement of the situation in the matter is correct. I was not on the board when these children were originally admitted. I had a talk with Mr. Tucker, and told him why we had dismissed the children, on account of their ancestry, associations, and reputation in the community. I am willing to provide another school for children of this class. No such provision has been made. The petition did not mention the Kirby children. I have heard that John Kirby owned a good deal of property in the county. I know Ed Kirby, the oldest child, and all of the children are practically of the same appearance. We did not act from appearance; so far as I know, these children have always properly behaved. They have been going to school for several sessions, and are ordinary pupils. George Tucker is a white man. The Kirby children attend Catfish church. The action taken was decided by the reputation and petition.

Some of the brothers and sisters of John Kirby could not be considered white. They sometimes associated together. I think it would be detrimental to the school to reinstate them. Sam Edwards carried the petition around. He had a brother who killed John Kirby. I do not know of these children associating with negroes.'

"L. E. Dew, being sworn, says: 'I have been a trustee of the school for two or three years. We considered the matter carefully when we dismissed the children. We were led into the action by frequent objections raised to these children and by others attempting to come in. I know the signers of the petition, and, to the best of my knowledge, they are patrons of the school. Objections were made besides the petition. I had a talk with Mr. Tucker, and explained to him why the children were dismissed, which was because they had the reputation of not being pure-blooded. John Kirby had the same reputation. He had some brothers and sisters who had more colored blood in them than white blood. I do not know whether they associated together or not. I am willing to make provisions for these children. I think it would be detrimental to the school to allow them to be reinstated. A separate school was established, but the teacher came down and refused to teach. There were two or three of these attempted schools, but the attempts have never been successful, owing to the fact that the patrons will not stick together. We did not give their guardian a hearing. So far as I know they have always conducted themselves properly. I did hear a report that one of the children carried a pistol to school, but no investigation was made, and I have never heard of any other misconduct. We didn't have any special kick against these children. John Allen, who is not a patron of the school, made some complaint, as did Sam Edwards, who carried the petition around. I think it was mentioned by others, who claimed that we were not properly exercising our office in allowing these children to remain in school on account of their color, reputation, and

family. Mr. Tucker is a white man, and owns property in the district. I have never heard of the children exercising any bad influence in school. Mrs. Tucker is an aunt of the children. As a result of the reinstating of the children there would be a wholesale resigning of the trustees and a tearing up of the school. I think the only teacher we could get to teach a separate school would be one of their class.'

"Chancler Hatchell, being sworn, says: 'I have lived in the school district about 14 months, and the reputation of the Kirby children is that they are not white. I objected to these children attending school because they were not clear-blooded. I do not know the ancestry of John Kirby, but by his looks he was not pure white. His boy Ed is as white as any one in the room. I heard from my children of their rowing once. Never heard of them breaking any rules in the school and of them being punished for conduct. I don't know who was to blame for the row. If the children were reinstated, I would take my children out of school and put them to work. I do not own any land, but live on a rented place.'

"Will Baxley, being sworn, says: 'I am one of the patrons of Dalcho school and object to the Kirby children going back, because they are not white. I do not own any property in the district, but run a share crop for Mr. Coleman; am his brother-in-law. Pay $6.50 taxes in Dillon and $5 in Marion. If these children were put back, I would keep mine at home and let them plow. My objection to the children is that people say they are not white. One of them cut my boy's coat about two years ago. I don't know how or who was to blame. Mine might have been. I have never heard of them being punished at school, and, as far as I know, they are good pupils.'

"S. T. Godbolt, being sworn, says: 'I knew Mrs. Kirby. She lived below Marion and had three brothers, who admitted that they were colored. They associated with her before she was married. She was the daughter of Liza

Foxworth. She was a white woman. I am no kin to John Kirby. I did not know anything about Mrs. Kirby after she was married; she moved away. I never heard of her or her children associating with negroes.'

"Ben Foxworth, being sworn, says: 'I am a half brother to Mrs. Kirby. We resided in Marion county together. She was a white woman.'

"Henry Kirby, being sworn, says: 'I am a half brother of John Kirby. We had the same mother, and were raised together. Sue Kirby was our mother. She was a white woman. John Godbolt was John Kirby's father.'

"J. E. Henry, being sworn, says: 'I am mayor of Latta and have known John Kirby a good many years. I don't think he was considered a white man. I do not know who his father was. Sue Kirby was his mother. He associated with white people in a business way. He did not attend the white church I attended.'

"Sam Edwards, being sworn, says: 'I live in Dalcho school district; am a patron and property owner. Own some land out of the district. I took the petition around, but did not have anything to do with the killing of John Kirby, and took no part in the trial. I knew him for several years. His reputation was that he was not clear-blooded. I do not know Kirby's children, but signed the petition, for I do not think they should attend this school. It would not be for the best interest of the school to reinstate them. I dictated the petition and circulated it. I send my children to this school. I took the petition to all who would sign it. I do not know whether all who signed it had children in the school. I turned the petition over to Lawrence Dew, a member of the board of trustees. The petition was not directed at the Kirby children, who had been going to school about two years. This is the first year I have been interested in the school. I do not know how near John Kirby was a white man or whether he attended white churches.'

"John C. Hayes, being duly sworn, says: 'I have lived in this school district all of my life, and knew John Kirby

before he was grown. He was not considered clear-blooded. Have been patronizing the school eight or ten years, or maybe longer. Have been interested in its welfare. Am a taxpayer, and own property in the district. I signed the petition, and do not think it would be to the advantage of the school to reinstate the Kirby children. They have been attending the school for several years. I do not know of John Kirby attending a white school. I don't know John Kirby's wife, nor whether he was a member of the First Baptist church at Dillon.'

"Stephen Bethea, being sworn, says: 'I live in the district, but have no children in school. However, I am interested in its welfare. I signed the petition, and knew John Kirby for several years. He was not considered a clear-blooded white man. I do not think it would be for the best interest of the school to reinstate these children. I do not know the extent of the mixture. He associated with white people in a business way, and I have seen him at white churches. I didn't know his children were going to school until the petition was circulated. I don't remember whether Ed Kirby was attending school at Catfish when I was or not. I have seen Henry Kirby. I am a taxpayer, own real and personal property in the district.'

"G. F. Bethea, being sworn, says: 'I live in Dalcho district. Knew John Kirby, and he was considered a Croatan. I do not know what the mixture of blood was, nor whether he associated with white people, except in a business way, nor whether his children attended the white schools. Did not know his father or mother.'

"John C. Allen, being sworn, says: 'I live in this school district. Am a taxpayer, and own property in it. Have children going to school, and am interested in its welfare. I knew John Kirby, and he was not considered white. That it would be of the best interest of the school that the children be excluded. I do not remember whether John Kirby attended white schools and white churches or not, nor

whether his children did so. I know his children have attended the white school recently. Do not know whether they attended school at Dothan or Dillon, or whether they were members of the white churches at Catfish and Dillon. I don't know how much he lacked of being clear-blooded.'

"John C. Sellers, being sworn, says: 'I am 65 years old, son of W. W. Sellers, who wrote a history of Marion county. I helped.him do the work. I knew John Kirby. His father was Big John Godbolt. He was one-eighth mixed blood. He was a soldier in the Confederate War and was badly wounded, and is now drawing a pension. His father was Long Billy Hayes, a white man. He died soon after the war. John Godbolt's mother was Martha Godbolt. Her mother was Polly Godbolt and sister of old John Godbolt, who was a white man. The family tree offered in evidence was made under my directions. I do not know who the mother of Sally Owens was. One-Arm Godbolt was the father of Martha Godbolt. He was a white man. Sally Owens was the mother of Polly Owens; she was a white woman. The mother of the Kirby children was a Foxworth; she was a white woman. The per cent. of the colored blood in the Kirby children is one-thirty-second. I knew John Kirby, and he didn't associate with negroes. I have heard that these children attended white schools and churches. My knowledge is not based entirely on tradition. I remember old John Godbolt, who died since I was married. He was my neighbor, and lived near me. I knew the Foxworth family. I did not know that John Godbolt had children who were colored. I knew Henry Kirby when he was a boy. I knew that the family was pretty badly mixed.'

"George W. Tucker, being sworn, says: 'I am guardian of the Kirby children. Live in Dalcho school district. Have had them more than 2 years. They have been attending white schools; this makes a part of the third session. Their father patronized the white schools 10 or 12 years ago, sending Ed and Lucy. I am their uncle; I married John Kirby's

sister.   I own a little property in Dalcho school district, and
the children own a plantation worth about $15,000, and a
house and lot in the town of Dillon.   I have known John
Kirby about 25 years.   I first knew John Kirby when he
was a boy.   He went to school very little, but attended the
white school at Kirby's Crossroads when he did go.   I knew
his wife, and she was said to be a white woman.   What little
association John Kirby had was with white people.   He was
a hard worker.   Sent his children to Dalcho public school
for 3 years about 12 years ago, and until he moved away,
and then sent to Dothan white school for 5 years, and moved
to the town of Dillon, where his children attended the white
graded school.   Six of them attended for 2 years.   He and
his wife were both members of the First Baptist church, and
were buried by their pastor, Rev. H. A. Willis.   Two of the
children died while they were in Dillon, and Mr. Willis
buried both of them.   Ed Kirby belongs to Catfish church,
which is a white church, and on the same grounds that the
white school is.   So far as I know, there was never any
objections to the children until they were dismissed.   Noth-
ing was said to me about it until they were instructed not to
return.   I have seen Henry Kirby and Ben Foxworth, and
they are both colored men.   Henry worked for me awhile
7 or 8 years ago.   He boarded in the kitchen, and ate at the
table with me some of the time.   I have not seen Ben Fox-
worth since he was a boy.   I do not know Julius Foxworth,
but know William, who, I think, is colored.   I have been
living in the Dalcho district 10 years.   I have been married
22 years.   My wife is a full sister of John Kirby.   The
property owned by the children is in the Dothan district.   I
talked with the trustees about dismissing the children, and
told them they had nothing like an eighth (⅛) colored blood
in them.   I did not agree to leave the matter to the patrons.
I think at the meeting the vote taken stood 13 to 1 for
dismissal.   All of the names signed to the petition were not
patrons; 11 are.   I notified some of the patrons of a meeting

to consider the question of reinstating the children that had been dismissed.'

"Ed Kirby, being sworn, says: 'I am 20 years old, brother of the children in question. Am not now attending school, but with my brothers attended Dalcho and Dillon schools. I am a member of the Catfish Baptist church. My father and mother were members of the First Baptist church of Dillon. My sister, Lucy, who is dead, was a member of Catfish church. Mr. Willis performed the funeral rites over my father and mother.'

"H. W. Langford, being sworn, says: 'I am president of the cotton mills of Dillon, and am clerk of the First Baptist church. The membership record shows that John and Annie Kirby were members of the First Baptist church. The names of no other Kirbys appear thereon.'

"Rev. H. A. Willis, being sworn, says: 'I am pastor of the First Baptist church in Dillon, and John Kirby and wife were received by letter a short time after I came here, about four years ago. I performed the rites over them when they were buried. I am a native of Virginia, and came here from Weldon, N. C. I never hesitate to conduct funeral services. I know the Catfish church only through association acquaintance.' "

*Messrs. Gibson & Muller,* for the petitioner, submit:

The exceptions raised five questions:

1. Under the testimony in the case as a matter of law, do the children in question belong to the white or colored race?

2. Does section 1761 of volume I of the Code of Laws of the State of South Carolina give boards of trustees the power and authority to arbitrarily dismiss pupils from school without a hearing, when in their opinion it will be to the best interest of the school?

3. Is there any testimony in the present case to warrant such a finding?

4. Have the trustees power and authority under the law to establish separate schools for the same race and to require pupils to attend a certain and definite school without regard to their convenience or preference?

5. Does not the act of the trustees in dismissing the children in question deprive them of their rights under the law, especially in view of the fact that the testimony shows without contradiction that a separate school could not be successfully maintained?

On first proposition, they cite: 21 S. C. L. 614; Const., art. III, sec. 33; art. XI, sec. 7; 26 Fed. Cases 15548; 20 A. & E. Ann. Cases 1297; 20 A. & E. Enc. of L. 213; 7 So. 261; 50 N. C. 11; 80 Va. 538; 28 Gratt. 939; 4 Ohio 353; 34 Me. 77. *On power of trustees:* 1 Code of Laws, sec. 1761; Const., art. XI, sec. 5; 17 Am. Rep. 412; 35 Cyc. 1140; 89 S. W. 506; 15 A. & E. Ann Cases 404. ' *Separate schools:* 1 Code of Laws 1756; 35 Cyc. 1114, 1111.

*Messrs. L. D. Lide* and *Joe P. Lane,* for respondents, cite: *Certiorari:* 76 S. C. 412. *Powers of board:* 1 Code of Laws, sec. 1761; 52 S. C. 201. *Racial status of children:* Const., art. III, sec. 33; art. XI, sec. 7; 3 Rich. L. 136; 2 Bail. 558; 2 Hill L. 616; 1 Bail. 270.

April 21, 1914.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

This is an application for a writ of *certiorari* for the purpose of determining by what authority the trustees summarily dismissed Herbert Kirby, Eugene Kirby, and Dudley Kirby from attending as pupils the Dalcho school, of Dillon county, for white children.

The facts out of which the controversy arose, and the action taken by the county board of education, will appear from the following decision rendered by them: "On or about the 24th day of January, 1913, John D. Coleman, Lawrence

E. Dew, and J. F. Williams, constituting the board of trustees of Dalcho public school, dismissed Herbert Kirby, Eugene Kirby, and Dudley Kirby from the white public school of that district. This proceeding was commenced by George W. Tucker, as guardian of the above named children, by petition to this board for a rule to show cause why the wards of petitioner should not be reinstated in the white public school of the district. The rule, as prayed for, was issued by the chairman of the county board, and the trustees of said school appeared on the 14th day of February, 1913. and filed their return to the rule, on which day the hearing of the matter was commenced, and same was completed on the 24th day of February, 1913. We deem it unnecessary to discuss in detail the questions raised by the testimony. Subdivision 3 of section 1761, vol. I, Code of Laws of 1912, gives school trustees the power 'to suspend and dismiss pupils, when the best interest of the school makes it necessary.' We understand, of course, that this section does not confer upon school trustees any power or authority to arbitrarily suspend or dismiss from school any child or children within their district. To the trustees of a school district is intrusted the welfare and best interests of their school, and this power to suspend or dismiss can be exercised by them in a proper case only when the welfare and best interest of such school renders such action absolutely necessary. Also the exercise of such power is always under the supervision of, and subject to review by, the county board of education, as, indeed, are all of the official acts of the trustees of a district. The return of the trustees to the rule shows, we think, that the action taken by them in this matter was for the best interest of the schools in the district. We find that all the material allegations set forth in the return are sustained by the testimony. After having given the matter careful consideration, we are of the opinion that the action of the trustees should be sustained. We think, however, proper school facilities should be provided for the wards of petitioner, and

all other children of the district in a like situation, as soon as practicable. The return to the rule to show cause herein having been adjudged sufficient, the rule should be discharged, and it is so ordered. It is further ordered herein that the trustees of the district be required to furnish and provide proper school facilities for the wards of petitioner, along with any and all other children similarly situated within the district."

The return of the trustees shows that these children had been attending the Dalcho school two sessions prior to the session during which they were dismissed; that objection had been made at various times to their presence in the school, but, as there were no others of that class attending, the trustees had been loath to take any action; that, shortly before they were dismissed, other children of the same class were attempting to enter the said school, and complaints were being made by its patrons; the trustees saw that, unless all children of that class were dismissed from the school, it would be materially injured. The return further shows that the trustees, in dismissing these children, were not actuated by any feeling of animosity towards them, but that their action was based upon what they deemed to be for the best interest of the school. They further alleged that they were ready and willing to provide a school for all children of this class in that district; that such a school had been provided in the past, but had been discontinued, because of friction among the patrons, and that, since the discontinuance of said school, the trustees had provided for the attendance of such children in other districts where they were allowed to enter the schools. The return also contains the following language: "That respondents are informed and believe that the wards of petitioners are not of pure Caucasian blood, and that this fact is generally known to the citizens of the community, and that it would not be right or proper, or for the best interest of the schools in said district, for the children to attend the white public schools, and for the further

reason that the environment and antecedents of the said children, and the knowledge of the public thereof, place them in a separate class from the white people of the community."

There was an appeal to the State board of education, which decided: "That the action of the Dillon county board of education be sustained, and the appeal be dismissed."

The synopsis of the testimony prepared by the petitioner's attorneys will be incorporated in the report of the case.

Section 385 of the Criminal Code, which embodies the provisions of an act passed in 1879, is as follows: "It shall be unlawful for any white man to intermarry with any woman of either the Indian or negro races, or any mulatto, mestizo, or half-breed, or for any white woman to intermarry with any other person than a white man, or for any mulatto, half-breed, negro, Indian, or mestizo to intermarry with a white woman; and any such marriage or attempted marriage, shall be utterly null and void, and of none effect; and any person who shall violate this section * * * shall be guilty of a misdemeanor, and, on conviction thereof, shall be punished."

Section 33, art. III, of the Constitution, provides that: "The marriage of a white person with a negro or mulatto, or person who shall have one-eighth or more negro blood, shall be unlawful and void."

Section 7, art. XI, of the Constitution, is as follows: "Separate schools shall be provided for children of the white and colored races, and no child of either race shall ever be permitted to attend a school provided for children of the other race."

Section 1780, Code of Laws 1912, provides that: "It shall be unlawful for pupils of one race to attend the schools provided by boards of trustees for persons of another race."

.The first question for consideration is whether section 33, art. III, of the Constitution, which provides that "the marriage of a white person with a negro or mulatto, or person who shall have one-eighth or more of negro blood, shall be

unlawful and void," entitles the child or parents, where one of them was a white person, and the other had *less* than one-eighth of negro blood, to be classed as a white person, in the exercise of his legal right.

The most sacred relation into which a man and woman may enter by contract with each other is that of marriage; yet the framers of our Constitution made it a part of our organic law that it should be lawful for a white person to marry another with negro blood, provided it was *less* than one-eighth. Such being the case, we are unable to discover any good reason why the child of such parents should not be entitled to exercise all the legal rights of a white person, except those arising from a proper classification, when equal accommodations are afforded. As, however, the right to classify is denied, the next question which naturally suggests itself for consideration is that relating to the power of classification in such cases.

We therefore proceed to determine whether the law allows a proper classification to be made between those without negro blood and those with *less* than one-eighth, when there is a provision for equal accommodation.

The law recognizes that there is a social element, arising from racial instinct, to be taken into consideration between those with and those without negro blood. The statutes and provisions of the Constitution hereinbefore quoted show that the law not only recognizes a classification, but makes it mandatory, and provides a penalty for failure to observe the laws in this respect, in the instances therein mentioned. The decisions prior to the abolition of slavery show that the classification between white and colored persons did not depend upon the extent of the mixed blood.

The rule was thus stated by Chancellor Harper, who delivered the opinion of the Court, in *State* v. *Cantey,* 2 Hill 614: "We cannot say what admixture of negro blood will make a colored person, and by a jury one may be found a colored

person while another of the same degree may be declared a white man. In general, it is very desirable that rules of law should be certain and precise; but it is not always practicable, nor is it practicable in this instance, nor do I know that it is desirable. The status of the individual is not to be determined solely by the distinct and visible mixture of negro blood, but by reputation, by his reception into society, and his having commonly exercised the privileges of a white man. But his admission to these privileges, regulated by the public opinion of the community in which he lives, will very much depend on his own character and conduct; and it may be well and proper that a man of worth, honesty, industry, and respectability, should have the rank of a white man, while a vagabond of the same degree of blood should be confined to the inferior caste. It will be a stimulus to the good conduct of these persons, and security for their fidelity as citizens."

The following language was used by the Court in the case of *White* v. *Tax Collector*, 3 Rich. 136: "It may happen that persons in equal degree from the African stock may present such different complexions and features that they would readily be assigned to different castes. Habit and education have so strongly associated with the European race the enjoyment of all the rights and immunities of freedom that color alone is felt and recognized as a claim. On the contrary, a strong repugnance prevails against a participation in the rights of citizenship by any who bear in their persons the traces of their servile origin. This aversion is, however mitigated by the deference which honesty, sobriety, and industry, and the qualities that unite in a respectable character, enforce on the mind. * * * Whatever rules may be adopted, the question of the reception of colored persons into the class of citizens must partake more of a political than a legal character, and, in a great degree, be decided by public opinion, expressed in the verdict of a jury."

In the case of *Flood* v. *News and Courier Co.,* 71 S. C. 112, 50 S. E. 637, 4 Ann. Cas. 685, this Court quoted with approval, the following charge of his Honor, the presiding Judge, in *Smith* v. *Chamberlain,* 38 S. C. 529, 17 S. E. 371, 19 L. R. A. 710 : "Among the citizens of South Carolina we have two distinct races. Before the law they are equal. The colored race, in our Courts of justice, stand on the same plane as the white race. Our laws bear equally on all, without regard to race, color, or previous condition. Our social conditions, however, are very different. Friends, companions, neighbors must be of our own choice. These relations and associations the law does not undertake to make or regulate for us. If we do not wish to associate with one class of society, there is no law that I know of which compels us to do so."

We also quote as follows from *Flood* v. *News and Courier,* 71 S. C. 112, 50 S. E. 637, 4 Ann. Cas. 685 : "Now, it must be apparent from consulting the texts of these amendments (thirteenth, fourteenth, and fifteenth to the Constitution of the United States), that there is not the slightest reference to the social conditions of the two races, and nothing can be imported into these amendments to give any such effect. All take pleasure in bowing to the authority of the United States in regard to these three amendments, but we would be very far from admitting that the social distinction subsisting between the two races has been in any way affected." The Court then quoted with approval the following language, used by the Court of Appeals of New York in the case of *People* v. *Gallagher,* 93 N. Y. 438, 45 Am. Rep. 232 : "This end can neither be accomplished nor promoted by laws which conflict with the general sentiment of the community upon whom they are designed to operate. When the government, therefore, has secured to each of its citizens equal rights before the law and equal opportunities for improvement and progress, it has accomplished the end for which it was organized and performed all of the func-

tions respecting social advantages with which it is endowed."
The Court also immediately thereafter quoted the following
language from *Plessy* v. *Ferguson,* 163 U. S. 537, 16 Sup.
Ct. 1138, 41 L. Ed. 256: "Legislation is powerless to eradi-
cate racial instincts or to abolish distinctions based upon
physical differences, and the attempt to do so can only result
in accentuating the difficulties of the present situation. If
the civil and political rights of both races be equal, one can-
not be inferior to the other civilly or politically. If one race
be inferior to the other socially, the Constitution of the
United States cannot put them on the same plane."

In the case of *Plessy* v. *Ferguson,* 163 U. S. 537, 16 Sup.
Ct. 1138, 41 L. Ed. 256, the Court further says: "The dis-
tinction between laws interfering with the political equality
of the negro and those requiring the separation of the two
races in schools, theaters, and railway carriages has been
frequently drawn by this Court. * * * A statute which
implies merely a legal distinction between the white and col-
ored races—a distinction which is founded in the color of
the two races, and which must always exist so long as white
men are distinguished from the other race by color—has no
tendency to destroy the legal equality of the two races. * * *
The object of the fourteenth amendment was undoubtedly
to enforce the absolute equality of the two races before the
law, but, in the nature of things, it could not have been
intended to abolish distinctions based upon color, or to
enforce social, as distinguished from political, equality, or a
commingling of the two races upon terms unsatisfactory to
either. Laws permitting, and even requiring, their separa-
tion in places where they are liable to be brought into contact
do not necessarily imply the inferiority of either race to the
other, and have been generally, if not universally, recognized
as within the competency of the State legislatures, in the
exercise of their police power. The most common instance
of this is connected with the establishment of separate
schools for the white and colored children, which has been

held to be a valid exercise of the legislative power even by Courts of States where the political rights of the colored race have been longest and most earnestly enforced."

One of the earliest decisions in such cases is that of *Roberts* v. *City of Boston,* 5 Cush. (Mass.) 198, in which Chief Justice Shaw said: "The great principle, advanced by the learned and eloquent advocate for the plaintiff (Mr. Charles Sumner), is that, by the Constitution and laws of Massachusetts, all persons, without distinction of age or sex, birth or color, origin or condition, are equal before the law. * * * But, when this great principle comes to be applied to the actual and various conditions of persons in society, it will not warrant the assertion that men and women are legally clothed with the same civil and political powers, and that children and adults are legally to have the same functions and be subject to the same treatment; but only that the rights of all, as they are settled and regulated by law, are equally entitled to the paternal consideration and protection of the law for their maintenance and security."

In the case of *Ex parte Plessy,* 45 La. Ann. 80, 11 South. 948, 18 L. R. A. 639, the Court says: "Even were it true that the statute is prompted by a prejudice on the part of one race to be thrown in such contact with the other, one would suppose that to be a sufficient reason why the pride and self-respect of the other race should equally prompt it to avoid such contact, if it could be done without the sacrifice of equal accommodations. It is very certain that such unreasonable resistance upon thrusting the company of one race upon the other, with no adequate motive, is calculated, as suggested by Chief Justice Shaw, to foster and intensify repulsion between them, rather than to extinguish it."

While the testimony shows that the children are entitled to be classed as white, nevertheless the action of the board of trustees was neither capricious nor arbitrary, as they are willing to provide equal accommodations for the Kirby children and those in the same class with them. The testimony

also shows that the decided majority of the patrons would refuse to send their children to the Dalcho school if the Kirby children were allowed to continue in attendance. Tested by the maxim, "The greatest good to the largest number," it would seem to be far better that the children in question should be segregated than that the large majority of the children attending that school should be denied educational advantages.

Subdivision 3 of section 1761, Code of Laws 1912, which provides "that the board of trustees shall also have authority, and it shall be their duty to suspend or dismiss pupils, when the best interest of the schools make it necessary," shows that the action of the trustees in dismissing the said children, was justified by the law of the land, and that the petition should be dismissed.

Petition dismissed.