CARR v. CORNING, Superintendent of
Public Schools, et al.

BROWNE JUNIOR HIGH SCHOOL PAR-
ENT–TEACHER ASS'N et al. v. MAG-
DEBURGER et al.

Nos. 9796, 9878.

United States Court of Appeals
District of Columbia Circuit.

Decided Feb. 14, 1950.

Messrs Austin L. Fickling and Leon A.
Ransom, Washington, D. C., with whom
Mr. U. Simpson Tate, Washington, D.C.
was on the brief, for appellant Carr.

Mr. Belford V. Lawson, Jr., Washington, D.C., with whom Mrs. Charlotte R. Pinkett, Mr. Aubrey E. Robinson, Jr., and Miss Marjorie A. McKenzie, Washington, D. C., were on the brief, for appellants Browne Junior High School Parent-Teacher association, et al.

Mr. Chester H. Gray, Principal Assistant Corporation Counsel, D. C., and Mr. Milton D. Korman, Assistant Corporation Counsel, D. C., Washington, D. C., with whom Mr. Vernon E. West, Corporation Counsel, D. C., Washington, D. C., was on the briefs, for appellees.

Before EDGERTON, CLARK and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

These are two appeals from judgments of the District Court of the United States for the District of Columbia, which appeals were consolidated for hearing in this court. The defendants below in both cases were the Superintendent of Schools and the members of the Board of Education of the District of Columbia.

The plaintiff below in No. 9796 was an infant who sued by her father and next friend. Her complaint was for a mandatory injunction and for a declaratory judgment. She alleged that she was a resident of the District of Columbia, a member of the Negro race, and a duly enrolled student in the public schools of the District. She asserted that she brought the action in behalf of herself and other students of the same race similarly situated. She alleged that she had enrolled in Browne Junior High School in the fall of 1946; that this school is set apart for the education of Negro pupils only; that by reason of excessive enrollment the period of instruction in the school was divided into two daily sessions of four and a half hours each, as contrasted with the standard six-hour period provided by the rules of the defendants and by statute; that she presented herself to the proper officials and demanded the type of instruction prescribed by the rules; that she was refused and thereupon demanded that she be transferred to the Eliot Junior High School, being the junior high school next most adjacent to her residence; that the defendants refused the transfer, on the ground that the Eliot Junior High School is for the use of white students only; that she thereupon applied to the Eliot Junior High School for admission; and that she was refused admission, on the ground that she is a Negro. This plaintiff further averred that she and those on whose behalf she sued were denied, solely on account of their race and color, the benefits of the free education required and provided by the laws of the District of Columbia. The prayer of her complaint was that the court declare that neither the laws of the United States nor the laws of the District of Columbia make the maintenance of separate schools for white and Negro races mandatory; that the defendants have exceeded their authority in requiring the plaintiff and those on whose behalf she sued to attend segregated schools; that such segregated schools in the District of Columbia are illegal; that the defendants are without authority to exclude Negroes from attendance upon white schools; and that the defendants be ordered to permit the plaintiff to attend the school most adjacent to her home in which the courses of education prescribed by the regulations are offered, without regard to the designation of such school on account of the race of the students enrolled therein. Answer was filed by the defendants. They admitted that the schools of the District of Columbia are divided into thirteen divisions, Divisions 1 to 9 being designated for white pupils and Divisions 10 to 13 for Negro pupils, and that children of either race are denied enrollment in schools other than those designated for their race. They admitted the factual allegations as to this particular plaintiff; they denied that the plaintiff or other Negro students suffered handicaps as a result of the separation of the schools. Affidavits were filed, with exhibits, by both the plaintiff and the defendants, and motions for summary judgment were made by both. The court granted the motion of the defendants. This appeal followed.

The plaintiffs below in No. 9878 were the Browne Junior High School Parent-Teacher Association and two pupils at that school

and their parents. They sued on behalf of themselves and others similarly situated. They made allegations concerning the maintenance of segregated schools in the District, the double shift then in effect at Browne Junior High, the transfer of some Browne Junior High pupils to other schools, and various facts concerning the possibilities of various reassignments of pupils. They alleged that the defendants' then present and proposed provisions for the education of the plaintiff pupils were a willful taking and deprivation of rights without due process of law, denial of the equal protection of the law, discriminatory and unreasonable. They prayed for an order of permanent injunction which would permit the plaintiff pupils to attend the junior high school which would guarantee to them educational opportunities, facilities and equipment equal to those afforded white students. Supporting affidavits were filed. The defendants moved to dismiss the action and filed affidavits in support of the motion. The plaintiffs answered the motion in detail, with exhibits. The District Court granted the motion to dismiss.

It was shown in an affidavit filed in the District Court prior to its decision and appearing in the printed joint appendix in this court, that on February 16, 1948, no pupils attending junior high schools in Divisions 10 to 13 were on a double-shift schedule; and elsewhere in the record, in an affidavit and not contradicted, appears the statement that a program put into effect February 2, 1948, completely eliminated the double-shift schedule in the Browne School and that in consequence "all junior high schools in the entire school system are on a full-day, single-shift schedule." Since the factual basis for the actions was the double shift in effect at Browne Junior High School at the time the actions were brought, and since the double shift was eliminated prior to the trial of the action in the court below, Judge Clark is of opinion that the cases became moot and were properly dismissed for that reason. A majority of the court, however, is of opinion that the general allegations concerning the allocations of schools and the practices of the Board of Education require the court to determine the questions thus posed. Upon consideration of the merits, Judge Clark concurs in the views about to be stated in this opinion.

It is urged that the separation of the races is itself, apart from equality or inequality of treatment, forbidden by the Constitution. The question thus posed is whether the Constitution lifted this problem out of the hands of all legislatures and settled it. We do not think it did. Since the beginning of human history, no circumstance has given rise to more difficult and delicate problems than has the coexistence of different races in the same area. Centuries of bitter experience in all parts of the world have proved that the problem is insoluble by force of any sort. The same history shows that it is soluble by the patient processes of community experience. Such problems lie naturally in the field of legislation, a method susceptible of experimentation, of development, of adjustment to the current necessities in a variety of community circumstance. We do not believe that the makers of the first ten Amendments in 1789 or of the Fourteenth Amendment in 1866 meant to foreclose legislative treatment of the problem in this country.

This is not to decry efforts to reach that state of common existence which is the obvious highest good in our concept of civilization. It is merely to say that the social and economic interrelationship of two races living together is a legislative problem, as yet not solved, and is not a problem solved fully, finally and unequivocally by a fiat enacted many years ago. We must remember that on this particular point we are interpreting a constitution and not enacting a statute.[1]

1. We do not mean to say that the people may not treat the problem by a provision in a constitution. (See, for example, Section 140 of Constitution of Virginia and Section 8 of Article 12 of Constitution of West Virginia.) Our question is merely whether by the Federal Constitution they have done so.

■ We are not unmindful of the debates which occurred in Congress relative to the Civil Rights Act of April 9, 1866,[2] the Fourteenth Amendment, and the Civil Rights Act of March 1, 1875.[3] But the actions of Congress, the discussion in the Civil Rights Cases,[4] and the fact that in 1862, 1864, 1866 and 1874 Congress, as we shall point out in a moment, enacted legislation which specifically provided for separation of the races in the schools of the District of Columbia, conclusively support our view of the Amendment and its effect.

■ The Supreme Court has consistently held that if there be an "equality of the privileges which the laws give to the separated groups", the races may be separated.[5] That is to say that constitutional invalidity does not arise from the mere fact of separation but may arise from an inequality of treatment. Other courts have long held to the same effect.[6]

This brings us to consider the operation of the school system in the case at bar.

The Board of Education of the District of Columbia is appointed by the United States District Court for the District of Columbia. It operates under direct mandate of the Congress.

To understand early statutes relating to the District of Columbia, it must be remembered that the District was originally composed of three entities, the City of Washington, the City of Georgetown, and the County of Washington outside the two cities. In 1862 Congress passed an act setting up a public school system for the County.[7] Seven school districts were established and a board of school trustees provided for each district. The act provided inter alia multa that a special tax might be levied upon property "owned by persons of color, for the purpose of initiating a system of education of colored children * * *."[8] On the next day, Congress passed an act directing the municipal authorities of the two cities (Washington and Georgetown) to set aside ten per cent of the taxes levied on property "owned by

2. 14 Stat. 27 (reenacted May 31, 1870, 16 Stat. 140), 8 U.S.C.A. §§ 41, 42.

3. 18 Stat. 335, 8 U.S.C.A. § 44 et seq. See Flack, The Adoption of the Fourteenth Amendment (1908).

4. 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835.

5. Missouri ex rel. Gaines v. Canada, 1938, 305 U.S. 337, 349, 59 S.Ct. 232, 83 L.Ed. 208; Sipuel v. Board of Regents, 1948, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; Fisher v. Hurst, 1948, 333 U.S. 147, 68 S.Ct. 389, 92 L.Ed. 604; Mitchell v. United States, 1941, 313 U.S. 80, 61 S.Ct. 873, 85 L.Ed. 1201; Gong Lum v. Rice, 1927, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172; Cumming v. County Board of Education, 1899, 175 U.S. 528, 20 S.Ct. 197, 44 L.Ed. 262; Plessy v. Ferguson, 1896, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; McCabe v. Atchison, T. & S. F. Ry., 1914, 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169. Of interest in this matter are Washington, Alex. & Georgetown R. R. v. Brown, 1873, 84 U.S. 445, 21 L.Ed. 675; Hall v. De Cuir, 1878, 95 U.S. 485, 24 L.Ed. 547; Slaughter-House Cases, 1873, 83 U.S. 36, 21 L. Ed. 394; Morgan v. Com. of Virginia, 1946, 328 U.S. 373, 66 S.Ct. 1050, 90 L. Ed. 1317, 165 A.L.R. 574.

6. Bertonneau v. Board of Directors of City Schools, C.C.La.1878, 3 Fed.Cas. page 294, No. 1,361; United States v. Buntin, C.C.S.D.Ohio 1882, 10 F. 730; Wong Him v. Callahan, C.C.N.D.Cal. 1902, 119 F. 381; School Dist. No. 7, Muskogee County, Okla. v. Hunnicutt, D.C.E.D.Okl.1931, 51 F.2d 528; Clarence C. Walker Civ. League v. Board of Pub. Instr., 5 Cir., 1946, 154 F.2d 726; Corbin v. County School Board of Pulaski County, 4 Cir., 1949, 177 F.2d 924; People ex rel. King v. Gallagher, 1883, 93 N.Y. 438, 45 Am.Rep. 232; Roberts v. City of Boston, 1849, 5 Cush. 198, 59 Mass. 198; State ex rel. Garnes v. McCann, 1871, 21 Ohio St. 198; Cory v. Carter, 1874, 48 Ind. 327, 17 Am.Rep. 738; State ex rel. Clark v. Maryland Inst. for Promotion of Mechanic Arts, 1898, 87 Md. 643, 41 A. 126; Reynolds v. Board of Education, 1903, 66 Kan. 672, 72 P. 274; Pearson v. Murray, 1936, 169 Md. 478, 182 A. 590, 103 A.L.R. 706; Graham v. Board of Education of City of Topeka, 1941, 153 Kan. 840, 114 P.2d 313; Martin v. Board of Education, 1896, 42 W.Va. 514, 26 S.E. 348; Boyer v. Garrett, D.C.Md., 1949, 88 F.Supp. 353, and many cases there cited.

7. Act of May 20, 1862, 12 Stat. 394.

8. Id. § 35 at 402.

persons of color", to be appropriated "for the purpose of initiating a system of primary schools for the education of colored children residing in said cities."[9] It was made the duty of school trustees "to provide suitable rooms and teachers for such a number of schools as, in their opinion, will best accommodate the colored children * * *." A month or so later, Congress changed its mind about the management under the latter act and created a separate "board of trustees of the schools for colored children in the cities aforesaid," and transferred to that board the powers of "the trustees of public schools" in respect to the colored schools.[10] In 1864 Congress made a number of changes in the law respecting public education, enacting a comprehensive statute on the subject.[11] In it the special tax for colored schools was eliminated, and the authorities were required to assign to the education of colored children the proportionate part of the school funds which the number of colored children bore to the whole number of children. In 1866 Congress passed a special act, which made clear that the apportionment of tax funds provided in the 1864 act was required in the two cities;[12] apparently some question had arisen as to whether the former act applied only to the County, due, no doubt, to its being entitled " 'An act to provide for the public instruction of youth in the county of Washington * * *.' " In the same year, Congress authorized the donation of certain lots "to the trustees of colored schools * * * for the sole use of schools for colored children".[13] In 1874 Congress enacted an act, which constituted Revised Statutes Relating to the District of Columbia,[14] and in it provided in respect to the County,[15] "It shall be the duty of the school-board to provide suitable and convenient houses or rooms for holding schools for colored children * * *." That act also contained this provision in respect to the County:[16]

"Any white resident shall be privileged to place his or her child or ward at any one of the schools provided for the education of white children in said portion of the district he or she may think proper to select, with the consent of the school-board; and any colored resident shall have the same rights with respect to colored schools."

In respect to the two cities, the Revised Statutes continued the separate "board of trustees of schools for colored children"[17] and "a superintendent of schools for colored children".[18] These various enactments by the Congress cannot be read with any meaning except that the schools for white and colored children were then intended to be separate. Moreover, it is significant, in respect to the constitutional points made here, that two of these statutes were enacted by the same Congress which proposed the Fourteenth Amendment and at almost the same time as that proposal. The Amendment was proposed by the Congress on June 16, 1866,[19] and these acts were dated July 23, 1866, and July 28, 1866.[20]

Appellants say that the earlier Revised Statutes dealing with colored schools were repealed in 1901, when they were not included in the Code for the District of Columbia which was enacted by Congress that year.[21] But that omission cannot be construed to mean that Congress has since 1901 intended to eliminate the separation of schools, because (1) later acts of Congress[22] in 1906, 1924 and 1947 specifically

9. Act of May 21, 1862, 12 Stat. 407.

10. Act of July 11, 1862, 12 Stat. 537.

11. Act of June 25, 1864, 13 Stat. 187.

12. Act of July 23, 1866, 14 Stat. 216.

13. Act of July 28, 1866, 14 Stat. 343.

14. Act of June 22, 1874, 18 Stat. part 2.

15. Id. § 281.

16. Id. § 282.

17. Id. § 294.

18. Id. § 304.

19. 14 Stat. 358; Flack, op. cit. supra note 3, at 140, says the resolution passed June 13, 1866.

20. Supra notes 12 and 13.

21. Act of March 3, 1901, 31 Stat. 1189.

22. Act of June 20, 1906, 34 Stat. 317; Act of June 4, 1924, 43 Stat. 374: Act of July 7, 1947, 61 Stat. 258.

provide for two first assistant superintendents, one to have supervision over "the white schools" and the other to have sole charge of the schools "in which colored children are taught"; (2) the repeal section of the 1901 Code reserves from repeal "all acts and parts of acts relating to municipal affairs only";[23] and (3) this court in 1910, in Wall v. Oyster,[24] held these sections of the Revised Statutes to be in effect.

The claim of unequal facilities in the present case rests upon the assignment of pupils to buildings. It is not contended that there is any inequality in respect to the distribution of free textbooks to all children,[25] compulsory education for all,[26] the length of school year, curricula, standards of promotion, events on school calendar, the organization of the school system, or teachers' qualifications, salaries, and annual, sick and sabbatical leave.[27] The statutes provide for the expenditure of funds for public schools for the education of colored children equal to that proportionate part of all moneys received or expended for school purposes which the colored children between the ages of six and seventeen years bear to the whole number of children, white and colored, between the same ages; the proportion to be ascertained by the last reported census of the population.[28] It is not contended that this statutory prescription is not met. The asserted inequality of privileges is based upon the assigned use of the various school houses in the system, with such consequences as flow from the differences in buildings.

The factual foundation for the litigation, as presented by the pleadings and affidavits, concerns the situation at Browne Junior High School. That school had, in November, 1947, an enrollment of 1826 pupils and a rated building capacity of 888 pupils. Its pupils were on a "double-shift" schedule of instruction, that is, half of them went to school in the morning and half of them in the afternoon. This condition of serious overcrowding was brought about by a number of factors, such as increases in population, shifts in population as new housing developments occurred, the stopping of new construction during the war, and vastly increased costs since then. It appears upon the record that the Board of Education years ago recognized the problem at Browne and secured in the appropriation act for 1942 funds for a site and for plans for a new junior high school (Kelly Miller) in the Browne School area at a cost of $875,000. In 1946 the provision as to maximum cost was raised to $980,000 and then to $1,350,000, and in 1948 it was raised to $1,808,000. According to the record, it was anticipated when this case was tried that the new building would be ready for occupancy in February of this year. Meantime, temporary expedients were adopted. The first was the double shift in effect from 1941 to 1947. There is nothing new about this method in the District. Of the senior high schools for white children, Central was on a double shift from 1921 to 1926, Western from 1920 to 1925, Eastern from 1931 to 1938, and Anacostia from 1938 to 1943; and the expedient has been used from time to time in other types of schools. It is recognized as an undesirable practice. In the case of Browne, the objections to the double shift caused the Board of Education to adopt another recommendation of the assistant superintendent. Pupils were transferred from elementary schools (at first two and then four) in the area to other available elementary buildings, and the released buildings were equipped as nearly as could be for junior high instruction and put in service as annexes to Browne. The result was the elimination of the double shift at

23. Sec. 1636 of 1901 Act, 31 Stat. 1435.

24. 36 App.D.C. 50, 31 L.R.A., N.S., 180.

25. 46 Stat. 62 (1930), D.C.Code § 31–401 (1940).

26. 43 Stat. 806 (1925), D.C.Code § 31–201 (1940).

27. 34 Stat. 319 (1906), 37 Stat. 156 (1912), 45 Stat. 1276 (1929), D.C.Code § 31–114 (1940); 59 Stat. 488 (1945), D.C.Code § 31–638 et seq. (1940) (Supp. VII); 36 Stat. 1395 (1911), D.C.Code § 31–607 (1940); 54 Stat. 349 (1940), D.C.Code § 31–632 et seq. (1940).

28. Revised Statutes Relating to the District of Columbia § 306, 18 Stat. part 2, § 306, as amended, D.C.Code § 31–1112 (1940).

Browne as of February 2, 1948. The use for junior high instruction of buildings designed as elementary schools is not desirable, but it is not novel in the District, as the affidavit of the assistant superintendent shows by many examples in both white and colored schools over the past twenty years.

Appellant in the Carr case (No. 9796) says that since the Browne School was overcrowded she had a right to be admitted to Eliot Junior High, the school next to Browne most adjacent to her home. The Board of Education says that all the thousand excess pupils at Browne could not be transferred to Eliot, since that school had an enrollment in November, 1947, of 771 pupils against a capacity of 918, leaving an available space for only some 150 additional pupils; that it could not solve the overcrowding at Browne by letting each pupil select his or her own school; and that it carefully considered the possibility of the use of Eliot but found the suggestion less desirable than the other expedients adopted. Appellants in the Browne case (No. 9878) say that the Board should have transferred all the pupils from Eliot to Eastern High School building, or to other junior high buildings, and used Eliot to accommodate the whole of the excess at Browne. The Board says that the transfers thus suggested were carefully considered by it but were deemed not feasible.

The Board of Education in the District undoubtedly has faced for many years acute problems in housing. The affidavits relating to the last twenty years clearly reflect them. A rapidly growing and rapidly shifting population must create such problems. It must be obvious that new buildings will be better than old ones, and so each neighborhood which gets a new building will suddenly have better school facilities than the older sections. It must also be obvious that all needs in a city growing and changing like Washington cannot be met at one time and that a school building program takes time. The problem pictured by these pleadings is one of meeting temporarily exigencies scheduled for a permanent solution which takes time.

The affidavits refer to the appropriations act for 1948. That act as it passed the Congress[29] carried $3,219,230 in appropriations for construction of schools during that year and $450,000 for the purchase of school sites, all for specific projects by name. There is no claim that these or any other appropriations discriminate as between any groups of pupils, either in quality or quantity of buildings or equipment or in precedence in meeting needs. Examination of that act shows that in respect to schools assigned for use by colored pupils it provided for the following: replace an existing senior high (Armstrong) at an authorized cost of $2,505,000; build a new senior high (Spingarn) at an authorized cost of $2,505,000; build a new gymnasium and stadium at Dunbar senior high; build two new junior high schools (Miller at $1,808,000 and a replacement for Shaw at the same amount); build an addition of eighteen rooms and a cafeteria at Randall Junior High; build four new elementary schools (a twenty-four room replacement of Walker and Jones, a new twenty-four room school called the Nalle, a sixteen room replacement for Morse and Twining, and a twenty-four room replacement of Birney); build additions to five elementary schools (eight rooms at Logan, temporary eight rooms at Crummell, eight at Payne, eight at Young, and eight at Syphax). In part, these projects, reflected in this act, were continuations of construction already begun and in part were the launchings of new buildings.

It is well known that Congress appropriates for only one year at a time and also that except for extreme emergency Congress does not permit the District Government to borrow funds. The school bond, so well known elsewhere in the country, is not authorized in the District. School construction on a pay-as-you-go basis involves temporary disadvantages. Certainly, in so far as the permanent building program revealed by this record is concerned, there is

29. 61 Stat. 432.

no evidence of an unequal program of facilities.

So the question narrows to whether the temporary expedients adopted by the Board of Education are unequal as between the races. The question is etched if we ask whether the same expedients are used when the pupils are white as are used when they are colored. So far as the record shows, they are. The affidavits show that the double shift and the use of buildings designed for other purposes are resorted to for schools of either group.

The selection of temporary expedients to meet situations which arise from the complicated factors which determine a school building program, lies primarily within the discretion of the administrative agency and the Congress, and unless we can discern a program or a policy of discrimination in these temporary matters, we do not see how the courts can interfere. The first assistant superintendent of schools in charge of the colored schools, himself a distinguished Negro educator who has spent some forty-five years in public education, said on this record:

"* * * I do not believe that *temporary* deprivation of the few facilities noted herein for a limited number of pupils of Browne Junior High School, and that only until the Kelly Miller Junior High School is completed, is a denial of substantially equal educational opportunity in the light of existing conditions and the history of educational opportunities both for white and colored children in the District of Columbia." As a matter of fact, the program which was followed in the matters which gave rise to this litigation was the recommendation of that school official.

 It is said that a report made in 1949 to the Congress by persons employed for that purpose, concerning school conditions in the District, demonstrates an unequal assignment of school buildings. That report is not in the record before us. In fact, it had not been prepared when the case

was heard below. An appellate court cannot be the trier of facts, and particularly it cannot decide a question of fact upon evidence which is not in the record. We cannot make findings of fact different from the allegations of the pleadings and affidavits upon which summary judgment or dismissal was entered below; nor can we consider the contents of the so-called Strayer Report, which was not before the trial court and is not in the record here. The authors of that Report were not subjected to cross examination in respect to it, and no opportunity has been afforded school officials to admit, deny or comment upon the statements made in it. What further, or different, information might have been furnished from other sources, we do not know. Wide differences appear to exist between the standards of capacity used by the Board of Education and those used by Strayer; for example, the capacity of Browne School measured by the former is 888 and measured by the latter is 783. We cannot resolve such differences. These cases, like all others, must be decided, so far as their facts are concerned, upon the records made in the trial court. We do not read Parker v. Brown,[30] the dissent in Burns Baking Co. v. Bryan,[31] or the concurring opinion of Mr. Justice Frankfurter in McCollum v. Board of Education [32] as indicating views to the contrary on this point. They recited facts and conditions of which courts usually take judicial notice, such as official reports or undisputed notorious facts. Neither the cases cited nor other authorities hold that a court may take judicial notice of the view of one particular person upon a disputed question of fact, such statement not having been submitted upon the record. Moreover, it is to be remembered that the official statistics in the case at bar are those of the Board of Education.

It is said that we may draw conclusions of inequality from naked general statistics, such as the average age of buildings, the average pupils per room, etc. But unexplained general statistics are notoriously un-

---

30. 1943, 317 U.S. 341, 63 S.Ct. 307, 87 L. Ed. 315.

31. 1924, 264 U.S. 504, 533, 44 S.Ct. 412,

68 L.Ed. 813, 32 A.L.R. 661.

32. 1948, 333 U.S. 203, 213, 68 S.Ct. 461, 466, 92 L.Ed. 649, 659, 2 A.L.R.2d 1338.

reliable premises for particularized conclusions. We do not even know, for example, how the stated ages of the buildings are computed; whether by years from the original cornerstone, or from the latest major reconstruction, or upon a weighted cost life. We cannot draw conclusions by speculation where the data necessary for certainty was not given the trial court.

So far as the facts and circumstances shown by this record are concerned, it appears that the treatment accorded these Negro plaintiffs, of which they complain, would have been accorded them had they been white. If the separation of the races in and of itself is not constitutionally invalid, such treatment, indiscriminate as to race, is not the unequal extension of privileges which violates constitutional prohibitions.

The judgments of the District Court are Affirmed.

EDGERTON, Circuit Judge, dissenting.

In September 1947 appellant Marguerite Carr was one of 1,638 pupils in Browne Junior High School, the rated capacity of which was 888 by the standards of the Board of Education and 783 by those of disinterested experts.[1] The school had been for many years so overcrowded that it was on a two-shift schedule.[2] Appellant complained to school authorities of the fact that she was not receiving the full-time schooling that the school law and regulations require.[3] She asked to be transferred to Eliot, a junior high school not far away which operated on a single shift and had vacancies. The Board of Education admits only white pupils to Eliot and Marguerite Carr is colored. Her request was therefore denied.

In October 1947 she brought a class action[4] on behalf of herself and "all other Negro children of school age of the District of Columbia" complaining that the Board's segregation policy deprives her and the others of the equal schooling to which they are entitled and asking that the appellees, the Board of Education and the Superintendent of Schools, be "enjoined to permit the Plaintiff and those on whose behalf she sues to enroll in and attend the school most adjacent to her and their homes in which the courses of education required and prescribed by law and the regulations of the Defendants are offered without regard to the previous or present use or designation of such school on account of the race or color of the students enrolled therein." The prayer for relief is independent of whatever particular schools appellant or others were then attending or might be attending at any later time. It does not even mention any school. It makes a broad and direct attack on compulsory racial segregation in the public schools of the District of Columbia. Marguerite Carr appeals from an order of December 22, 1947 granting summary judgment to the appellees.

Meanwhile, in November and December, 1947, the Board of Education had begun to eliminate the double shift at Browne Junior High School; not, as requested, by

---

1. Strayer report, infra note 6, p. 343; p. 300.

. 2. Pupils in the morning session attended from 8:00 a. m. to 12:30 p. m., those in the afternoon session from 12:45 to 5:15 p. m. They had 4 hours and 5 minutes of school time and 25 minutes for lunch, a total of 4½ hours. During the winter it was the practice to drop the last period of the afternoon session so that pupils might get home before dark. This reduced actual instruction time to 3 hours 25 minutes and the over-all school day to 3 hours and 40 minutes. Classes were 40 minuutes long at Browne and 55 minutes long at other junior high schools. In single-session schools, 5 periods per week are available for clubs, supervised study, counseling and guidance, and after-school hours are available for extended activities. This was not the case at Browne.

3. An Act of Congress provides that "All children of school age being instructed in the schools of the District beyond the second grade shall be given a whole school-day session." D.C.Code (1940) § 31—1101. "The session of day junior high schools shall begin at 9:00 o'clock A.M. and close at 3:00 P.M." Rules and Regulations of the Board of Education, Chap. 13, § 5.

4. Federal Rules of Civil Procedure, Rule 23, 28 U.S.C.A.

transferring pupils from Browne to a white junior high school, but by transferring elementary pupils from white elementary schools to Eliot and to Eastern, a white senior high school, and putting many Browne Junior High School pupils in the vacated elementary buildings. These buildings lack important junior high school facilities.

In January 1948 the Browne Parent-Teachers Association, with two Browne pupils and their parents, all of whom are appellants here, brought a class action to enjoin appellees from assigning junior high school pupils to elementary school buildings and to require them "to permit the plaintiff pupils and others similarly situated to enroll in and attend the junior high school which will guarantee to them equal educational opportunities, facilities and equipment as are afforded white junior high school students." The complaint shows that Browne, the other colored junior high schools, and the colored senior high schools are greatly overcrowded while Eliot, the other white junior high schools, and the white senior high schools have much surplus space. It alleges that Browne junior high school students assigned to elementary buildings are "denied any proper instruction in music, art, typewriting, home economics, woodshop, printshop, and metalshop or other vocational skills such as is provided white junior high students." In February 1948 the plaintiffs filed as an exhibit a table furnished by the Public Schools of the District of Columbia, Office of the Statistician, which shows the following facts among others:

| | Capacity 1946–1947 | Enrollment Oct. 9, 1947 |
|---|---|---|
| Browne Junior High School (Colored) .... | 888 | 1,836 |
| Eliot Junior High School (white) ............. | 918 | 765 |
| All colored junior high schools ............. | 6,510 | 8,420 |
| All white junior high schools ............. | 12,033 | 10,303 |

5. 62 Stat. 542.

6. "Report of a Survey of the Public Schools of the District of Columbia Con-

| | Capacity 1946–1947 | Enrollment Oct. 9, 1947 |
|---|---|---|
| Cardozo High School (colored) ........... | 1,040 | 1,630 |
| Eastern High School (white) ............. | 2,726 | 1,725 |
| Central High School (white) ............. | 2,400 | 1,538* |
| All colored senior high schools ............. | 3,732 | 4,680 |
| All white senior high schools ............. | 15,649 | 10,877 |

*Includes 501 veterans.

In March 1948 the District Court granted appellees' motion to dismiss appellants' complaint, on the ground that no violation of law or abuse of discretion was shown.

When these appeals were argued counsel informed the court that Browne Junior High School was no longer on a shift schedule and that Marguerite Carr was no longer at Browne but was attending Cardozo, a colored senior high school, on a shift schedule.

Much additional information has since become available. In 1948 Congress appropriated $100,000 "for a complete survey of the public-school system of the District of Columbia with respect to the adequacy of the present plant and personnel, as well as educational methods and practices, to serve the District, said survey to be conducted under the supervision of a person qualified by training and experience in the field of public-school education to be appointed by the chairmen of the subcommittees on District of Columbia appropriations of the respective appropriations committees of the Senate and the House of Representatives * * *."[5] Between July 1, 1948 and February 28, 1949 this statutory survey was made and a report of 980 pages was prepared by George D. Strayer, Professor Emeritus of Education in Teachers College of Columbia University, and a staff of 22 specialists. The report, commonly called the Strayer report,[6] was published in the

ducted Under the Auspices of the Chairmen of the Subcommittees on District of Columbia Appropriations of the Respective Appropriations Committees of

spring of 1949. The data it contains are "available data * * * of which we may take judicial notice * * *."[7] The Supreme Court has said: "We have frequently held that in the exercise of our appellate jurisdiction we have power not only to correct error in the judgment under review but to make such disposition of the case as justice requires. And in determining what justice does require, the Court is bound to consider any change, either in fact or in law, which has supervened since the judgment was entered."[8]

Appellees contend the facts do not amount to denial of substantially equal schooling. The facts themselves are not in dispute. Those stated in the Strayer report are more recent and much fuller than those dealt with in the record and briefs but do not differ from them materially in any other respect. The result of these appeals should be the same without the Strayer report as with it. The records in these cases show great inequalities between white and colored schools, including use by many Browne pupils of elementary buildings that are grossly inadequate for junior high school purposes, a great shortage of space in the colored junior and senior high schools, and a large surplus of space in the white junior and senior high schools.

Since appellant Carr's class action was brought on behalf of all Negro children of school age in the District of Columbia, lack of equal schooling at any Negro school in the District was pertinent to the action when it was brought and is still pertinent. Since colored students who would be allowed to attend Eastern High School if they were white are excluded from Eastern and required to attend Cardozo High School, to the extent of the difference between Eastern and Cardozo they are denied equal schooling because of their color. Since colored pupils who would be allowed to attend Eliot Junior High School if they were white are excluded from Eliot and some of them are required to attend Browne Junior High School, to the extent of the difference between Eliot and Browne they are denied equal schooling because of their color. In each case the difference is great.

I. *Inequality of Cardozo and Eastern high schools.* Appellant Carr and other Cardozo students who live in the far northeastern part of Washington, where there is a large colored population but no colored high school, are handicapped by that fact even before they reach school.[9] The "normal travel distance for senior high school students" is one mile and a half.[10] Colored

the Senate and House of Representatives." Washington, Government Printing Office, 1949.

7. Parker v. Brown, 317 U.S. 341, 363, cf. pp. 364–368, 63 S.Ct. 307, 319, 320, 322, 87 L.Ed. 315. "The principal statistical sources" of the information the Supreme Court used were publications of the United States Tariff Commission and the Department of Agriculture.

The court does not deny that Negro schooling in the District of Columbia is greatly inferior to white schooling. The court refuses to consider the question because the Strayer report has not been formally introduced. This is, I think, substantially like denying credit to a publication of the Census Bureau or the Weather Bureau. Parker v. Brown shows that the court errs. Moreover, refusal to notice the facts disclosed by the Strayer report serves no useful purpose. Facts need only be proved by a preponderance of evidence, but the

substantial correctness of the essential Strayer figures is beyond reasonable doubt. They are not merely undisputed but necessarily taken from appellees' own records. If appellees should wish to dispute any of them, which is unlikely, they could do so in a petition for rehearing. Yet the court is ruling in effect that appellants must go through the ritual of a new trial and a new appeal in order that they may formally present official statistics. This seems to me one of the "needless failures of justice that are caused by the artificial impotence of judicial proceedings" when courts fail to make liberal use of the principle of judicial notice. 9 Wigmore, Evidence § 2583 (3d ed. 1940).

8. Patterson v. State of Alabama, 294 U.S. 600, 607, 55 S.Ct. 575, 578, 79 L.Ed. 1082.

9. Maps, Strayer 334, 338; cf. 332

10. Strayer 333.

students who live near Eastern have to travel three or four miles to Cardozo. Appellant Carr's residence is some 4 miles from Cardozo and about 1½ miles from Eastern.

"In view of the fact that the modern secondary school program on both junior and senior high school levels includes responsibility for the physical development and the recreational activity of the youth in this age group, the school site has become an important factor in meeting this responsibility—so important that the prevailing minimum standard advocated by authorities in the field and practiced by school systems wherever possible is as follows: Senior high school minimum site, 20 acres. Junior high school minimum site, 15 acres."[11] "The school plant must provide physical facilities, rooms and equipment, essential to healthful living. This will include indoor and outdoor physical facilities for healthful play and recreation. * * * In addition to its impact on the safety, health and development of children and youth in school, the physical plant including building, grounds, and equipment plays a major role in facilitating teaching and learning. It matters not how well trained, how well paid or how devoted the teachers may be, the degree to which they can achieve their best work is conditioned by the fitness of the rooms, the equipment, the apparatus and the materials they have with which to work." Without good buildings and equipment "children and youth are denied the kind of education they need and society is denied the complete development of the kind of citizen it needs."[12]

Their exclusion from Eastern High School handicaps Cardozo sudents in these respects. Eastern has a site of 11.7 acres. Cardozo has a site of less than one acre. Cardozo is closely hemmed in on all sides by streets. It has no playground or recreational facilities.[13] Eastern has a modern building. The Cardozo plant was built about 1905. It was abandoned as a white "business" high school in 1931.[14] On a thousand-point scale the Eastern plant rates 764 in "educational adequacy." The Cardozo plant rates 371.[15] Dr. Strayer told an appropriations subcommittee that two of the three colored high schools, Cardozo and Armstrong, should be abandoned: "They would not be accepted at any community that I know of in the United States as satisfactory buildings." [16]

At least since 1938, Cardozo students have been badly handicapped by overcrowding. The capacity of their building by Strayer standards is 845. Its enrollment ranged from 1,341 in 1938 to 1,721 in 1948.[17] "The cafeteria has a capacity for only 248 people at one sitting, approximately one-sixth of the enrollment of the school. The library can accommodate at one time only 84 pupils. The gymnasium, dressing room and shower facilities are extremely limited. The assembly hall seats but one-fourth of the enrollment. School functions are being carried on in basement rooms, corridors, assembly hall, sidewalks and public highway. Fire protection throughout the building is extremely inadequate." [18] At least since 1942 Eastern, on the other hand, has not been occupied to anything like its Strayer capacity, 2,215,[19] which in turn is 511 less than its capacity by appellees' standards.[20] Its enrollment in October 1948 was 1,526.[21] Its surplus capacity was 689 while Cardozo's surplus enrollment was 876.

The overcrowding at Cardozo involves, among other handicaps absent at Eastern, a *triple* shift[22] and greatly oversized class-

11. Strayer 321.

12. Strayer 298.

13. Strayer 332, 337, 339.

14. Strayer 339.

15. Strayer 332, 337.

16. Senate subcommittee on appropriations, 1949, Hearings on H.R.No. 3082, District of Columbia Appropriations Bill for 1950, p. 66.

17. Strayer 545, 337.

18. Strayer 339–340.

19. Strayer 545.

20. Table I infra.

21. Strayer 332.

22. Statement of Dr. Corning, Hearings, supra note 16, p. 57, June 1949; Washington Evening Star, Sept. 12, 1949.

es. "There is widespread agreement that for the best results in teaching, classes in the regular subjects in junior and senior high schools should not ordinarily exceed 30 pupils. Many school administrators feel that the maximum should be lower." [23] At Eastern the median sized class in 1948 was 30. At Cardozo, despite the triple shift, the median sized class was 36.5. In all eight white high schools there were only 55 classes larger than 39; at Cardozo alone there were 92 such classes. At Eastern there were two classes of between 40 and 44 and none larger than 44. At Cardozo there were 65 classes of between 40 and 44, 20 of between 45 and 49, and 7 of over 50. [24]

Students at Cardozo are handicapped by omission from their curriculum of practical subjects taught at Eastern. "All of the white general high schools offer homemaking instruction to the extent of the following credits: Anacostia, 7; Central, 6; Coolidge, 7; Eastern, 6; McKinley, 7; Roosevelt, 4; Western, 1; and Wilson, 6. These credits are distributed over such subject matter as clothing and textiles, child care, food and dietetics, home management, home nursing, home living, and general homemaking." [25] Armstrong, the colored technical high school, offers 10 credits in homemaking courses, but the two non-technical colored high schools, Cardozo and Dunbar, "have no work in this field. This is particularly unfortunate in view of the fact that the less privileged the pupils, the relatively greater are both the economic and psychological values of such practical arts education." [26] Similarly, all white high schools offer credits in manual arts. Eastern has 20 such credits. Dunbar has 4. Cardozo has none. "Again it would seem that the economic and psychological values of education in the practical arts are denied to those who need them most." [27]

Students at Cardozo are handicapped in guidance and counseling. Although the greater teaching load in the colored high schools [28] reduces the extent to which regular classroom teachers can participate in guidance, in 1948 only one guidance counselor was provided for the 1,721 students at Cardozo. Two were provided for the 1,526 students at Eastern. [29]

I have compared Cardozo with the white high school nearest the homes of appellant Carr and other named appellants. The Strayer report shows that the contrast between Cardozo and any one of the other white high schools is quite as striking. While Cardozo has a site of less than one acre and is hemmed in by streets, Central, the white high school nearest Cardozo, has a site of 9 acres. [30] Cardozo has an educational adequacy rating of 371, Central of 708. [31] The median size of classes at Central was 25.9, at Cardozo 36.5. [32] On October 22, 1948, while Cardozo enrolled 1,721 senior high school students and had a space shortage of 876, Central enrolled 893 senior high school students and 544 junior high school students and still had a space surplus of 513. [33] "Despite the fact that the boundaries of [Central's] home area have been extended far into the normal home area of the Roosevelt and McKinley where heavy surplus capacity now exists (Roosevelt 655 and McKinley 705) Central still fails to utilize its plant or hold enough students for economic operation of its educational program. A circle of 1½ miles radius, the normal travel distance for senior high school students, extends beyond the locations of both the Roosevelt and the McKinley." [34]

II. *Inequality of Browne and Eliot junior high schools.* Ending the double shift at Browne did not make Browne equal to Eliot. Appellees concede "that the absence of assembly halls, cafeterias and gymnasi-

23. Strayer 623.

24. Strayer 624.

25. Strayer 607-608.

26. Strayer 608.

27. Strayer 609.

28. Table II infra.

29. Strayer 612, 701.

30. Strayer 333, 337, 339.

31. Strayer 332, 337.

32. Strayer 624.

33. Strayer 333, 332, 337.

34. Strayer 333.

ums in the Blow and Webb [elementary] Schools will require the curtailment of some of the socialization activities" which are "cardinal features of the junior high school program." The Strayer report shows that although the capacity of the Browne building is only 783, in October 1948 the colored junior high school population of the Browne area, housed either in the Browne building or in elementary buildings, was 2,498.[35] At Eliot, on the other hand, capacity exceeded enrollment. In October 1949 the Browne building still housed 396 pupils in excess of capacity, even by Board of Education standards, and 471 other Browne pupils were housed in Blow and Webb elementary buildings.[36] Even after the opening of the excellent Kelly-Miller colored junior high school in December 1949 and the removal of junior high school students from elementary schools, students of Browne are still at a disadvantage if appellees' advance estimates prove correct. Those estimates indicated a colored junior high school population in the Browne area of 2,550 in September 1949. On the Strayer basis the capacity of the Kelly-Miller school is 1,000,[37] which makes the combined capacity of Kelly-Miller and Browne 1,783. The necessary result is either great overcrowding in one or both of these schools, or use of elementary buildings that lack necessary facilities for junior high school students.[38] The Strayer report recommends expenditure of $920,000 for needed expansion at Browne.[39] There is no overcrowding at Eliot.

As stated above, "There is widespread agreement that for the best results in teaching, classes in the regular subjects in junior and senior high schools should not ordinarily exceed 30 pupils." [40] At Eliot the median sized class was 32.2. At Browne it was 39.4, an excess over recognized standards of 30 per cent and over. Eliot of 22 per cent. While Eliot had 19 classes of between 40 and 44 pupils, Browne had 95 such classes. Eliot had no classes larger than 44. Browne had 20 Classes of between 45 and 49, and 8 between 50 and 54.[41]

III. *Inequality of the white and colored public school systems of the District of Columbia.* Throughout the public school system, Negro children are denied equal schooling because of their color.

"Thousands of children in the District of Columbia are handicapped in their educational development by being enrolled in oversize classes." [42] This handicap and the related one of overburdened teachers are much greater in colored schools than in white. Table II shows that in 1948 the median-sized classes were nearly one-fifth larger in colored than in white junior high schools and more than one-fifth larger in colored than in white senior high schools. There were nearly one-sixth more pupils per teacher in colored than in white junior high schools and fully one-sixth more pupils per teacher in colored than in white senior high schools. The teaching load (pupil hours per week per teacher) was more than one-fifth greater in colored than in white junior high schools and nearly one-fourth

35. Table I infra.

36. Washington Evening Star, Oct. 28, 1949.
 Differences in capacity as measured by Strayer standards and by Board standards are not differences in regard to facts. They are differences of opinion as to what "percent utilization of instructional pupil stations" is proper. (Strayer 300) They have no bearing on the issues in this case. Both by Strayer standards and by Board standards the capacity of Eliot, Eastern, Central, white senior high schools, and white junior high schools exceeds their enrollment and the capacity of Browne, Cardozo, colored senior high schools, and colored junior high schools is less than their enrollment.

37. Strayer 345.

38. "School officials said 1,294 students will be transferred to the new building which has a capacity of 1,440" on the Board of Education basis. Washington Post, Dec. 1, 1949. Even this would leave 1,256 at Browne if the Board of Education's advance estimate of enrollment in the area was correct. It would mean serious overcrowding, by Strayer standards, both at Browne and at Kelly-Miller.

39. Strayer 376.

40. Strayer 623.

41. Strayer 624.

42. Strayer 941.

greater in colored than in white senior high schools.

The greater overcrowding of colored classes and overloading of colored teachers begins in kindergarten. In 1948 10.7% of the classes in white kindergartens and 17.2% of those in colored kindergartens enrolled between 36 and 40 children; 2.3% of the white classes and 11.7% of the colored enrolled over 45.[43] In white kindergartens the ratio of pupils to teachers was 51.5, in colored kindergartens 59.7.[44] Half the colored children of kindergarten age were not in school. It would require 52 more teachers to provide for them.[45]

In white elementary schools, grades 1 to 6, less than one per cent (.3%) of the classes enrolled more than 40 children each and no class enrolled more than 45. But in the colored elementary schools 43.6% of the classes enrolled more than 40 children each and 13.8% enrolled more than 45.[46] "About 130 additional classes would be required to reduce the class size" in colored elementary schools "to an equality" with that in white elementary schools.[47] In regular classes in elementary schools, grades 1 to 6, the ratio of white pupils to teachers was 32.5, the ratio of colored pupils to teachers 37.9.[48]

There is great disparity in number and distribution of schools and classrooms. Though colored and white enrollment in elementary schools, including kindergarten and ungraded classes, was approximately equal in 1948, there were 73 elementary schools with 919 classrooms for white children and only 49 elementary schools with 693 classrooms for colored children.[49] For half the colored children of kinder-garten age no classrooms were available. It would require 26 more classrooms to provide for them.[50] Dr. Strayer told the appropriations subcommittee that the proportion of children of kindergarten age who attend kindergarten "is very much lower among the Negro children than it is among the white, and I take it that that is pretty certainly because the facilities are not available." [51] In the twelve school areas in which there were both white and colored elementary schools, there was an over-all surplus of space for over 1,600 white children and an over-all shortage of space for over 5,200 colored children.[52] With almost identical numbers of white and colored junior high school students, there were 11 white and 7 colored junior high school buildings.[53] White junior high schools had surplus space for 679 pupils, while colored junior high schools were used 2,372 beyond their capacity.[54] For 9,654 white senior high school students there were 8 buildings; for 4,555 colored there were 3. In October 1948, enrollment in colored senior high schools exceeded the capacity of the buildings by 1,523 pupils.[55] The white senior high schools had space for 3,062 more students than were enrolled.[56] If any *two* of these white schools had been turned over to colored students, or closed, all white high school students could have been accommodated, without crowding, in the other six white high schools. Appellee Superintendent of Schools himself told the appropriations subcommittee that "the increased colored population has caused so much overcrowding in the colored high schools that their accreditation is in danger." [57] The white senior high schools are so well distributed that there is one within a moderate

43. Strayer 420.

44. Strayer 48.

45. Strayer 389, 420.

46. Strayer 419.

47. Strayer 420.

48. Strayer 48.

49. Strayer 323, 364; 329, 365; four additional elementary buildings were used by colored junior high school students. Strayer 299.

50. Strayer 389.

51. Supra note 16, at p. 70.

52. Strayer 350 to 363.

53. In October 1948 many colored junior high school students were housed in elementary-school buildings. Strayer 340, 343, 345.

54. Strayer 340, 343.

55. Strayer 337.

56. Strayer 332.

57. Supra note 16, at p. 58.

distance of every student.[58] All three colored senior high schools are within a few blocks of each other in the congested central part of the city, and many students have to travel 3 or 4 miles to reach them.[59]

"Where buildings have been recently constructed, those occupied by colored children are as good as those occupied by white children."[60] But there is great disparity in age and quality between white school buildings as a whole and colored school buildings as a whole. 42.4% of the white and 58.4% of the colored elementary buildings were over 40 years old in 1948.[61] The Strayer report recommended abandonment of 40 classrooms used by white children and 110 used by colored children.[62] Nearly half the white but only a quarter of the colored elementary school buildings had educational adequacy scores above 500 on the basis of 1000. About a quarter of the buildings used by white elementary pupils and more than a third of those used by colored elementary pupils scored below 300.[63] Of buildings (including some elementary buildings) occupied by junior high school students, 10 white and 5 colored were built within the past thirty years; 2 white and 6 colored are over 40 years old.[64] Of the colored junior high school plants, 3 rated above and 4 below 500 on a scale of 1000; of the white junior high school plants, 9 rated above and 2 below 500.[65] All 8 of the white senior high school plants rated above 600, all but 2 above 700; all 3 of the colored senior high school plants rated below 500.[66] The worst white was better than the best colored senior high school.

The Strayer survey estimated needed expenditures for white elementary school buildings at $4,623,000 and for colored elementary school buildings at $9,874,500. For senior, vocational, and junior high schools the Strayer estimates of need were $5,065,-500 for the white and $20,590,500 for the colored.[67]

The disparity between white and colored high schools in home-making and manual arts courses has been pointed out in connection with Eastern and Cardozo.

Colored students in need of special services (visiting instructors, speech correction, remedial reading, lip reading, and individual child study) are severely handicapped in comparison with white children of like needs. In 1947-48 such services were furnished to 3,431 white children by 43 workers and 3 special supervisors. They were furnished to 4,031 colored children by 15 workers and 1 special supervisor.[68] In "ungraded" classes for children not adjusted to the standard curriculum there were in October 1948, 1,145 children in white elementary schools, 474 in colored elementary schools.[69]

Colored pupils generally "have more serious and numerous problems of social and vocational adjustment" than white pupils and therefore need more guidance and counseling.[70] They actually get less. In the elementary schools the classroom teacher is the counselor. Since elementary teachers are burdened with larger classes in the colored schools than in the white they can of course give less attention to the problems of individual children. Special counselors are provided in junior, vocational, and senior high schools, but in great disproportion as between the white and colored schools. "In 1946, the over-all ratio of pupils to counselor was reported as 390 to 1 in the white schools, and 690 to 1 in the Negro schools."[71]

Speaking specifically of the public schools of the District of Columbia, the President's Committee on Civil Rights said in 1947: "Negro schools are inferior to white schools in almost every respect. The

58. Map, Strayer 334.
59. Map, Strayer 338.
60. Strayer 330.
61. Strayer 299.
62. Strayer 365–366.
63. Strayer 326, 329.
64. Strayer 299.
65. Strayer 343, 340; Table II infra.
66. Strayer 332, 337; Table II infra.
67. Strayer 375–377.
68. Strayer 508, 509.
69. Strayer 48.
70. Strayer 701.
71. Strayer 701.

white school buildings have a capacity which is 27 percent greater than actual enrollment. In the colored schools, enrollment exceeds building capacity by eight percent. Classes in the Negro schools are considerably larger and the teaching load of the Negro teachers considerably heavier. Less than one percent of all white school children, but over 15 percent of colored children, receive only part-time instruction. Similar inequalities exist in school buildings, equipment, textbook supplies, kindergarten classes, athletic, and recreational facilities." [72] The Strayer report is more recent as well as specific.

IV. *Unconstitutionality of racial discrimination in public schools.* It is plain that pupils represented in these appeals are denied better schooling and given worse because of their color. This the Constitution forbids. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection." [73] "Discriminations based on race alone are obviously irrelevant and invidious" [74] and therefore arbitrary and unreasonable. Their imposition upon any citizen by any agency of government is reconcilable neither with due process of law [75] nor with the equal protection of the laws. [76]

The Supreme Court has applied this general principle to public education in a number of familiar cases. [77] The Court of Appeals for the Fourth Circuit has recently applied it as between segregated high schools. [78] The leading cases have been based on the Fourteenth Amendment of the Constitution, which is not directly applicable in the District of Columbia. The Fifth Amendment, which is directly applicable here, contains no equal protection clause. But the Supreme Court has held that governmentally enforced racial discrimination in housing violates not only the equal protection clause [79] but also the due process clause [80] of the Fourteenth Amendment, and the Court has repeatedly indicated that arbitrary and injurious discrimination may violate the due process clause of the Fifth Amendment. [81] As long ago as 1896 the Court said "the Constitution * * * forbids, so far as civil and political rights are concerned, discrimination by the General Government, or by the States, against any citizen because of his race." [82]

It is said there are not enough vacancies in the better schools for all pupils. This is no answer to these complaints of racial discrimination. As long as good schools cannot accommodate all, the pupils who attend them may be chosen on any reasonable basis, including proximity, intelligence, and conduct. They may not be

---

72. To Secure These Rights (1947), p. 90.

73. Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774.

74. Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 203, 65 S.Ct. 226, 232, 89 L.Ed. 173.

75. Buchanan v. Warley, 245 U.S. 60, 82, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A.1918C, 210, Ann.Cas.1918A, 1201.

76. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441.

77. The leading case is Missouri ex rel. Gaines v. Canada, Registrar of the University of Missouri, 305 U.S. 337, 59 S. Ct. 232, 83 L.Ed. 208. Recent cases are Sipuel v. Board of Regents, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247; Fisher v.

Hurst, 333 U.S. 147, 68 S.Ct. 389, 92 L. Ed. 604.

78. Corbin v. County School Board of Pulaski County, Va., 4 Cir., 177 F.2d 924.

79. Shelley v. Kraemer, supra note 76.

80. Buchanan v. Warley, supra note 75.

81. Hirabayashi v. United States, supra note 73; Detroit Bank v. United States, 317 U.S. 329, 63 S.Ct. 297, 87 L.Ed. 304; Currin v. Wallace, 306 U.S. 1, 13–14, 59 S.Ct. 379, 83 L.Ed. 441; Steward Machine Co. v. Davis, 301 U.S. 548, 585, 57 S.Ct. 883, 81 L.Ed. 1279, 109 A.L.R. 1293.

82. Gibson v. State of Mississippi, 162 U.S. 565, 591, 16 S.Ct. 904, 910, 40 L.Ed. 1075.

chosen for the color of their hair or their skin.

Appellees say in effect: (1) We try to avoid discrimination against colored pupils,[83] but (2) the rapid growth of the colored population, its location, its movement, and the war, have made this impossible; yet (3) in general, we do avoid discrimination against colored pupils. The first proposition is immaterial except as it tends to support the second, for the question is not whether appellees have good intentions but whether appellants have equal schooling. The second proposition supports appellants' case, not appellees', for the more clearly segregation precludes equality the more clearly it must go. The third proposition contradicts not only the second but the facts, and would not conclude the rights of any pupil even if it were true. It may be that the same segregated system which discriminates against most colored pupils discriminates, or has sometimes discriminated, against some white pupils. But in the restrictive covenant case, as in others, the Supreme Court pointed out that the rights created by the Fourteenth Amendment "are, by its terms, guaranteed to the individual. The rights established are personal rights. It is, therefore, no answer to these petitioners to say that the courts may also be induced to deny white persons rights * * * on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." [84] This is also true of the right to due process of law created by the Fifth Amendment. While many children are handicapped in their schooling because of their race it is no defense to say that some children of the same race are not, and some children of a different race are, so handicapped.

Two railroad cars may be, in themselves, exactly alike. But two schools are seldom if ever fully equal to each other in location, environment, space, age, equipment, size of classes, and faculty. Therefore it follows from the mere number of public schools, at every level, in the District of Columbia that discrimination against many individual pupils of one race or the other because of their race cannot be avoided while segregation is maintained. In other words objective equality, which is clearly required, cannot here be attained without abolishing segregation. The appellees should therefore be required to cease to exclude any pupil from any school because of color.

83. E. g., they say expenditures are divided in a fair ratio between white and colored schools. This proposition is quite erroneous. They attempt to show fairness by comparing (1) the ratio of total expenditures for colored and white schools with (2) the ratio of colored to white *children of school age in 1940*. (The statute, D.C.Code (1940) § 31—1112, requires appellees to use this latter ratio in allocating funds.) Obviously appellees' comparison is much less enlightening than a comparison between (1) the ratio of expenditures for colored and white schools and (2) the ratio of colored to white *pupils currently attending public schools*. But when *total* expenditures are used, even this latter comparison is misleading, because of the shortage of colored school buildings and the relative abundance of white school buildings. Equal total per capita expenditures for one group that is already housed and another group that must, to a substantial extent, be housed out of the expenditures, do not indicate either equality of treatment or equality of education.

Between 1930 and 1948 colored enrollment in the public schools increased by about 60%, from 24,960 to 41,612, while white enrollment decreased slightly. (Strayer 308) Table II *infra* shows that much of the increase in colored enrollment took place between 1938 and 1948, and that there was a large *decrease* in white enrollment during this period. Table III *infra* compares the expenditures shown by the Superintendent's affidavit of December 5, 1947 with school enrollment for 1947–48. This table shows that expenditures per white pupil for every item in the segregated budget, with the single exception of "capital outlay," substantially exceeded expenditures per colored pupil. Omitting the "capital outlay" expenditure, the per capita outlay for white pupils was almost one quarter greater than for colored pupils.

84. Shelley v. Kraemer, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161, 3 A.L.R.2d 441.

V. *Unconstitutionality of racial segregation in public schools.* If it be assumed that objective equality *could* be attained, the question whether enforced segregation in public schools would then be valid becomes one upon which the Supreme Court has never squarely ruled, although the Court has repeatedly spoken of segregation as valid.[85] Since Plessy v. Ferguson,[86] enforced segregation in travel has been upheld as "reasonable," though it is now under attack by the United States.[87] But the Supreme Court held over thirty years ago that an ordinance forbidding Negroes to move into predominantly white city blocks and whites to move into predominantly Negro city blocks was a denial of due process of law.[88] The Court thereby recognized that enforced racial segregation in housing is arbitrary and cannot reasonably be thought to serve a public purpose. I submit that enforced racial segregation in schooling is even more arbitrary. Instead of serving a public purpose it fosters prejudice and obstructs the education of whites and Negroes by endorsing prejudice and preventing mutual acquaintance. Adults are not restricted in their contacts to people who live in the same block, but many children are practically restricted in their contacts to children who attend the same school. The education required for living in a cosmopolitan community, and especially for living in a humane and democratic country and promoting its ideals, cannot be obtained on either side of a fence that separates a more privileged majority and a less privileged minority. Segregation in travel is intermittent and affects chiefly adults. Segregation in colleges and universities affects young people whose patterns of feeling and behavior have been formed. But segregation in public schools affects children during their formative years and does so continually.

It also affects them unequally. Here at least, as a current brief for the United States says of segregation in general, " 'separate but equal' is as much a contradiction in terms as 'black but white': facilities which are segregated by law solely on the basis of race or color, cannot in any real sense be regarded as equal."[89] It is notorious that segregated colored schooling is never equal to segregated white schooling in objectively measurable ways.[90] Independently of objective differences between white and colored schooling, school segregation means discrimination against Negroes for two distinct reasons. (1) By preventing a dominant majority and a depressed minority from learning each other's ways, school segregation inflicts a greater economic and social handicap on the minority than on the majority. It aggravates the disadvantages of Negroes and helps to preserve their subordinate status. (2) School segregation is humiliating to Negroes. Courts have

---

85. The cases are more or less distinguishable on their facts. E. g., Cumming v. Board of Education, 175 U.S. 528, 543, 20 S.Ct. 197, 44 L.Ed. 262, expressly disclaimed ruling on segregation; contrary to the later cases, it upheld denial of *any* high school education to Negroes. In Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172, the plaintiff's contention, which the Court overruled, was that Chinese should be classified as white.

86. 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, decided in 1896.

87. Infra note 89.

88. Buchanan v. Warley, 1917, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149, L.R.A. 1918C, 210, Ann.Cas.1918A, 1201.

89. Brief for the United States in Henderson v. United States, S.C.No. 25, Oct. Term, 1949, p. 12. [Probable jurisdiction noted, 69 S.Ct. 740].

90. In education, "the separate and equal principle has nowhere been fully honored. Educational facilities for Negroes in segregated areas are inferior to those provided for whites. Whether one considers enrollment, over-all costs per student, teachers' salaries, transportation facilities, availability of secondary schools, or opportunities for undergraduate and graduate study, the consequences of segregation are always the same, and always adverse to the Negro citizen. * * * This Commission concludes that there will be no fundamental correction of the total condition until segregation legislation is repealed." Higher Education for American Democracy; Report of the President's Committee on Higher Education, Vol. II (1947), pp. 31, 35.

sometimes denied that segregation implies inferiority. This amounts to saying, in the face of the obvious fact of racial prejudice,[91] that the whites who impose segregation do not consider Negroes inferior. One might as well say that the whites who apply insulting epithets to Negroes do not consider them inferior. Not only words but acts mean what they are intended and understood to mean. Segregation of the Czar of Russia meant that others were not thought fit to associate with him. Segregation of a depressed minority means that it is not thought fit to associate with others. Both whites and Negroes know that enforced racial segregation in schools exists because the people who impose it consider colored children unfit to associate with white children. As the President's Committee on Civil Rights said of the "separate but equal" policy in general, it "brands the Negro with the mark of inferiority and asserts that he is not fit to associate with white people. * * * No argument or rationalization can alter this basic fact: a law which forbids a group of American citizens to associate with other citizens in the ordinary course of daily living creates inequality by imposing a caste status on the minority group." [92] One of the recommendations of the President's Committee was that Congress prohibit segregation in the public schools of the District of Columbia.[93] In my opinion the Constitution does not permit courts to wait for Congress to act.

Appellees say that Congress requires them to maintain segregation. The President's Committee concluded that congressional legislation "assumes the fact of segregation but nowhere makes it mandatory." [94] I think the question irrelevant, since legislation cannot affect appellants' constitutional rights.

When the Fifth Amendment was adopted Negroes in the District of Columbia were slaves, not entitled to unsegregated schooling or to any schooling. Congress may have been right in thinking Negroes were not entitled to unsegregated schooling when the Fourteenth Amendment was adopted. But the question what schooling was good enough to meet their constitutional rights 160 or 80 years ago is different from the question what schooling meets their rights now. "It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits of the essentials of fundamental rights." [95]

It is sometimes suggested that due process of law cannot require what law cannot enforce. No such suggestion is relevant here. When United States courts order integration of District of Columbia schools they will be integrated. It has been too long forgotten that the District of Columbia is not a provincial community but the cosmopolitan capital of a nation that professes democracy.[96]

---

91. Courts have held it libelous to call a white man a Negro. Collins v. Oklahoma State Hospital, 76 Okl. 229, 184 P. 946, 947, 7 A.L.R. 895; Spencer v. Looney, 116 Va. 767, 82 S.E. 745; Spotorno v. Fourichon, 40 La.Ann. 423, 4 So. 71; Flood v. News Courier Co., 71 S.C. 112, 50 S.E. 637, 4 Ann.Cas. 685; Jones v. R. L. Polk & Co., 190 Ala. 243, 67 So. 577; Upton v. Times-Democrat Pub. Co., 104 La. 141, 28 So. 970; Hargrove v. Oklahoma Press Pub. Co., 130 Okl. 76, 265 P. 635; May v. Shreveport Traction Co., 127 La. 420, 53 So. 671, 674, 32 L.R.A.,N.S., 206.

92. To Secure These Rights (1947), pp. 79, 82.

93. Ibid., pp. 166, 171.

94. Ibid., p. 90.

95. Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361.

96. "I think it quite obvious * * * that the existence of discriminations against minority groups in the United States is a handicap in our relations with other countries." Statement of Dean Acheson, then Acting Secretary of State, in a letter to the Fair Employment Practice Committee on May 8, 1946; quoted in To Secure These Rights, supra note 92, at 146–147.

## TABLE I

| | Browne Junior High School (colored) | In Browne building[7] | In elementary schools[7] | Eliot Junior High School (white) | Cardozo High School (colored) | Eastern High School (white) |
|---|---|---|---|---|---|---|
| **Capacity according to** Strayer standards ..... | 783[1] | | | 810[3] | 845[5] | 2215[6] |
| Board of Education standards .......... | 888[2] | | | 918[4] | 1040 | 2726[4] |
| **Enrollment** | | | | | | |
| September (?) 1938 | 1100 | | —— | 1041[7] | 1341[10] | 2434[10] |
| 1940 | 1358 | | —— | 1011 | 1411 | 2458 |
| 1942 | 1526 | | —— | 1032 | 1234 | 1775 |
| 1944 | 998 | | 353 | 919 | 1577 | 1753 |
| 1946 | 1678 | | 582 | 786 | 1500 | 1750 |
| February 1948 | 1052[8] | | 1092[8] | 778[9] (Jan. 28) | —— | —— |
| September (?) 1948[7] | | 2463 | | 751 | 1711 | 1559 |
| October 22, 1948[11] | | 2498 | | 750 | 1721 | 1526 |

1. Strayer 343; cf. 300.
2. Appellees' answer in No. 9796; cf. Strayer 300.
3. Strayer 340.
4. Appellants' Complaint in No. 9878.
5. Strayer 337.
6. Strayer 332.
7. Strayer 544.
8. Affidavit in No. 9878.
9. Affidavit in No. 9878.
10. Strayer 545.
11. Strayer 343, 345, 340, 332, 337.

## TABLE II

| | Junior High Schools Colored | White | Senior High Schools Colored | White | All Schools Colored | White |
|---|---|---|---|---|---|---|
| **Enrollment** | | | | | | |
| 1938–39[1] | 7,129 | 13,769 | 4,614 | 13,713 | 36,780 | 62,990 |
| 1947–48[1] | 9,299 | 10,836 | 5,279 | 11,498 | 44,372 | 55,468 |
| 1948 (Oct. 22)[2] | 9,079 | 9,148 | 4,555 | 9,654 | 42,287 | 47,482 |
| Number of school buildings | 7[3] | 11[3] | 3[3] | 8[3] | 70[4] | 96[4] |
| Shortage (—) or Surplus (+) of building capacity in relation to enrollment, Oct. 22 1948[2] | —2,372 | +679 | —1,523 | +3,062 | —— | —— |
| Rating of buildings on scale of 1000[3] | 3 above 500<br>4 below 500 | 9 above 500<br>2 below 500 | All below 500 | All above 600 | —— | —— |

1. Strayer p. 46.
2. Strayer; high schools, pp. 332, 337, 340, 343; vocational schools, pp. 336, 337; elementary schools, p. 389.
3. Strayer pp. 332, 337, 340, 343. Does not include elementary school buildings used by secondary school students.
4. Strayer p. 299. Includes vocational schools, and elementary schools used by high school students.

## TABLE II—Cont'd.

| | Junior High Schools Colored | Junior High Schools White | Senior High Schools Colored | Senior High Schools White | All Schools Colored | All Schools White |
|---|---|---|---|---|---|---|
| Pupil-teacher ratio[5] | | | | | | |
| 1938–39 | 32.3 | 29.5 | 29.6 | 28.3 | 35.6[6] | 30.9[6] |
| 1947–48 | 28.9 | 25.1 | 28.8 | 23.8 | 32.8[6] | 28.3[6] |
| Oct. 1948 | 27.8 | 23.5 | 23.1 | 19.7 | —— | —— |
| Pupil hours per week per teacher Dec. 28, 1948[7] | 732 | 605 | 698 | 564 | —— | —— |
| Median size of Classes, 1948[8] | 36.23 | 30.54 | 34.0 | 27.65 | —— | —— |

5. Strayer p. 48.

6. Enrollment (Strayer p. 46) divided by number of teachers, excluding teachers' colleges (Strayer pp. 45–46).

7. Strayer p. 50. The standard fixed by the Board of Education for secondary schools is 750 pupil-hours per week. In practice it has been held that this figure should not be exceeded. "To approach this index as an average indicates a definite overload." Strayer pp. 47–48.

8. Strayer p. 624. "Although opinions differ on the question of optimum class size there is widespread agreement that for the best results in teaching, classes in the regular subjects in junior and senior high schools should not ordinarily exceed 30 pupils. Many school administrators feel that the maximum should be lower." Strayer p. 623.

## TABLE III

### EXPENDITURES IN RELATION TO ENROLLMENT

Segregated expenditures shown by an affidavit of the Superintendent of Schools made December 5, 1947 and filed in No. 9796. Joint or undistributed expenditures not included.

1947–48—white school enrollment, 55,468; colored, 44,372. (Strayer, p. 46)

*Per capita* computation added.

| | Amount White Schools | Amount Colored Schools | Per Capita White Schools | Per Capita Colored Schools |
|---|---|---|---|---|
| Administration | $ 129,179 | $ 93,271 | $ 2.33 | $ 2.10 |
| Supervision and Instruction | 7,398,646 | 4,866,593 | 133.38 | 109.68 |
| Vocational Education | 138,044 | 87,280 | 2.49 | 1.97 |
| Operation of buildings and grounds | 1,106,325 | 592,360 | 19.95 | 13.35 |
| Auxiliary Educational Services | 44,800 | 16,300 | .81 | .37 |
| Capital Outlay | 744,150 | 1,939,230 | 13.41 | 43.70 |
| Totals | $9,561,144 | $7,595,034 | $172.37 | $171.17 |